766 A.2d 1126

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
MARTEL JOHNSON, A/K/A HASSAN K. MUHAMMAD,
DEFENDANT–APPELLANT.

Argued October 11, 2000—Decided February 28, 2001.

524

*Jay L. Wilensky*, Assistant Deputy Public Defender, argued the cause for appellant (*Ivelisse Torres*, Public Defender, attorney).

*Melaney S. Payne*, Deputy Attorney General, argued the cause for respondent *(John J. Farmer, Jr.*, Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

STEIN, J.

The No Early Release Act, *N.J.S.A.* 2C:43–7.2 (NERA or the Act), provides for mandatory minimum sentences for convictions constituting "violent crime" as defined by that statute. We granted certification to consider whether a jury must decide if a crime is violent for purposes of NERA or if that determination can be made by the sentencing court, and whether the mandatory minimum terms imposed by NERA constitute cruel and unusual punishment under the United States and New Jersey Constitutions.

I

NERA, enacted in 1997, imposes a mandatory minimum prison term of 85% of the overall sentence, and a mandatory three- to five-year period of post-release parole supervision, for any first- or second-degree conviction that is found to constitute a violent crime. *N.J.S.A.* 2C:43–7.2(a),(c). The Act defines "violent crime" as

[a]ny crime in which the actor causes death, causes serious bodily injury as defined in subsection b. of *N.J.S.* 2C:11–1, or uses or threatens the immediate use of a deadly weapon. "Violent Crime" also includes any aggravated sexual assault or sexual assault in which the actor uses, or threatens the immediate use of, physical force.

[*N.J.S.A.* 2C:43–7.2(d) ].

The Act also provides that the grounds for imposing an enhanced sentence must be "established at a hearing after the conviction of the defendant and on written notice to him of the ground proposed." *N.J.S.A.* 2C:43–7.2(e).

A grand jury returned an eleven-count indictment against petitioner Martel Johnson, accusing him of robbing two customers of a check-cashing establishment at gunpoint on August 8 and August

9, 1997, respectively, and of unlawfully possessing a firearm when he was later arrested in connection with the alleged robberies. None of the counts of the indictment referred to NERA, and none charged Johnson with committing a violent crime within the meaning of NERA.

The trial court severed the charges relating to the August 9 incident and Johnson's arrest from those relating to the August 8 incident, and held separate jury trials. The facts adduced at the trial respecting the August 8 robbery indicated that Johnson approached his alleged victim on a bicycle as she exited the check-cashing store, then alighted from the bicycle, moved to within inches of the victim, and demanded her money as he aimed what appeared to be a black pistol at her. The victim gave Johnson $255. The facts adduced at the trial respecting the August 9 robbery indicated that Johnson accosted his victim in a similar manner and that he stole $265.

Approximately one week after those incidents, officers who had been alerted to the alleged robberies observed Johnson standing outside the check-cashing store, with an apparent bulge in his waistband area, and arrested him. The officers found in Johnson's possession a black, pistol-shaped BB gun, later identified by the victim of the August 8 robbery as the weapon used by Johnson during the robbery. According to a State weapons expert, Johnson's BB gun was capable of causing serious bodily injury.

The first jury considered the August 9 and arrest-scene charges and found Johnson guilty of third-degree possession of a firearm without a permit, *N.J.S.A.* 2C:39–5(b), but did not return a verdict on the counts relating to the alleged robbery. The court consequently declared a mistrial on the unresolved counts. The second jury considered the August 8 incident and found Johnson guilty of first-degree robbery, *N.J.S.A.* 2C:15–1, second-degree possession of a firearm with intent to use it unlawfully against a person, *N.J.S.A.* 2C:39–4(a), and third-degree possession of a firearm without a permit, *N.J.S.A.* 2C:39–5(b).

A defendant convicted of first-degree robbery or possession of a firearm with intent to use it against another person is subject to a mandatory imprisonment term of between one-third and one-half of the overall sentence. *N.J.S.A.* 2C:43–6(c). At Johnson's sentencing hearing, however, the State requested that the court impose enhanced mandatory-minimum sentences pursuant to NERA for Johnson's robbery and second-degree weapon possession convictions, on the ground that Johnson's conduct constituted violent crime within the meaning of NERA, because the facts adduced at trial clearly established that Johnson aimed the BB gun at the victim and thereby "threaten[ed]" her. The court heard no new evidence at the hearing held to determine the applicability of NERA. Accepting the State's analysis of the trial evidence, the court concluded that Johnson did, in fact, threaten the August 8 victim with the BB gun and was therefore eligible for sentencing under NERA. In making that determination, the court did not indicate whether it applied a "preponderance of the evidence" or a, "beyond a reasonable doubt" standard of proof.

Applying NERA, the court sentenced Johnson to an eighteen-year term on the robbery conviction with a fifteen-year, three-month and eighteen-day parole disqualifier, and ordered a five-year term of post-release parole supervision. The court imposed concurrent sentences of ten years, with the NERA-mandated eight and one-half year parole disqualifier, on the second-degree weapon possession charge, and five years each, with two and one-half year parole disqualifiers, on the third-degree weapon possession charges.

Johnson appealed, arguing, in part, that the mandatory-minimum sentence mandated by NERA constituted cruel and unusual punishment under the Eighth Amendment to the United States Constitution. The Appellate Division upheld the enhanced sentence. *State v. Johnson,* 325 *N.J.Super.* 78, 88–89, 737 *A.*2d 1140 (1999). We initially denied certification. 163 *N.J.* 12, 746 *A.*2d 458 (2000). However, we subsequently vacated that order and granted certification limited to Johnson's constitutional challenges

to NERA. 163 *N.J.* 393, 749 *A.2d* 367 (2000). Following our grant of certification, the Supreme Court of the United States decided *Apprendi v. New Jersey*, 530 *U.S.* 466, 120 *S.Ct.* 2348, 147 *L.Ed.*2d 435 (2000). The parties then filed supplemental briefs addressing whether, in view of *Apprendi*, the "violent crime" factor on which Johnson's NERA sentence was based must be presented in an indictment and found by a jury beyond a reasonable doubt, in accordance with the Due Process Clause and Sixth Amendment of the United States Constitution and Article I of the New Jersey Constitution.

## II

We first address Johnson's contention that the hearing conducted by the sentencing court to determine the applicability of NERA violated his rights to indictment and trial by jury under the U.S. Constitution and Article I of the New Jersey Constitution.

At issue here is, ultimately, the scope of the principle that the Constitution "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 *U.S.* 358, 364, 90 *S.Ct.* 1068, 1073, 25 *L.Ed.*2d 368, 375 (1970). While this foundational requirement universally is regarded as one of "surpassing importance," *Apprendi, supra*, 530 *U.S.* at ——, 120 *S.Ct.* at 2355, 147 *L.Ed.*2d at 447 (2000), its specific application in the context of modern, highly-structured sentencing statutes raises difficult issues for reviewing courts. The Supreme Court of the United States "has made clear beyond peradventure that *Winship*'s due process and associated jury protections extend, to some degree, 'to determinations that [go] not to a defendant's guilt or innocence, but simply to the length of his sentence,' " *id.* at ——, 120 *S.Ct.* at 2359, 147 *L.Ed.*2d at 451 (quoting *Almendarez–Torres v. United States*, 523 *U.S.* 224, 251, 118 *S.Ct.* 1219, 1234, 140 *L.Ed.*2d 350, 373 (1998) (Scalia, J., dissenting)). However, the Court has "never attempted to define precisely the constitutional limits" of the *Winship* doctrine. *McMillan v. Pennsylvania*, 477

*U.S.* 79, 86, 106 *S.Ct.* 2411, 2416, 91 *L.Ed.*2d 67, 76 (1986). Mindful of the "analytical tensions" inherent in the cases guiding our analysis, *State v. Apprendi,* 159 *N.J.* 7, 51, 731 *A.*2d 485 (1999) (Stein., J., dissenting), *rev'd, Apprendi v. New Jersey, supra,* 530 *U.S.* 466, 120 *S.Ct.* 2348, 147 *L.Ed.*2d 435, we relate those precedents to the challenged provisions of NERA.

A

As will become clear, our analysis properly begins with *McMillan v. Pennsylvania, supra.* In that case, the United States Supreme Court upheld, by a 5–4 majority, Pennsylvania's Mandatory Minimum Sentencing Act, 42 *Pa. Cons.Stat.* § 9712 (1982). The Pennsylvania statute provides that any person convicted of certain enumerated felonies must be sentenced to a minimum of five years' imprisonment if the sentencing judge determines, based on a preponderance of the evidence, that the person "visibly possessed a firearm" during the commission of the offense. The statute does not, however, increase the maximum sentencing range that the defendant would face. *McMillan, supra,* 477 *U.S.* at 81–84, 106 *S.Ct.* at 2413–15, 91 *L.Ed.*2d at 73–75.

The *McMillan* majority characterized the "visibly possessed a firearm" element of the Pennsylvania statute as a sentencing "factor," as opposed to a conventional element of the underlying crime, *id.* at 89–90, 106 *S.Ct.* at 2418, 91 *L.Ed.*2d at 78–79, and held that States may attach to crimes non-elemental "factors" that are relevant to determining punishment and that can be found by a sentencing judge by a preponderance of the evidence, so long as (1) those factors do not increase the defendant's maximum sentence, and (2) the statute does not appear to represent a legislative effort to evade the reasonable doubt requirement. *Id.* at 87–89, 106 *S.Ct.* at 2417–18, 91 *L.Ed.*2d at 77–78. Applying that framework to the Pennsylvania statute, the majority held:

> Section 9712 neither alters the maximum penalty for the crime committed nor creates a separate offense calling for a separate penalty; it operates solely to limit the sentencing court's discretion in selecting a penalty within the range already available to it without the special finding of a visible possession of a firearm.

Section 9712 "ups the ante" for the defendant only by raising to five years the minimum sentence which may be imposed within the statutory plan. The statute gives no impression of having been tailored to permit the visible possession finding to be a tail which wags the dog of the substantive offense. Petitioners' claim that visible possession under the Pennsylvania statute is "really" an element of the offenses for which they are being punished—that Pennsylvania has in effect defined a new set of upgraded felonies—would have at least more superficial appeal if a finding of visible possession exposed them to greater or additional punishment, cf. 18 U.S.C. § 2113(d) (providing separate and greater punishment for bank robberies accomplished through "use of a dangerous weapon or device"), but it does not.

[Id. at 87–88, 106 S.Ct. at 2417, 91 L.Ed.2d at 77–78 (citations omitted).]

Both of the dissenting opinions in *McMillan* criticized the majority for, essentially, abdicating to the States the question of whether a specific fact constitutes an "element" of an offense. *Id.* at 93, 106 S.Ct. at 2420, 91 L.Ed.2d at 81 (Marshall, J., dissenting); *id.* at 96, 106 S.Ct. at 2421, 91 L.Ed.2d at 82 (Stevens, J., dissenting). As Justice Stevens noted,

[t]oday the Court holds that state legislatures may not only define the offense with which a criminal defendant is charged, but may also authoritatively determine that the conduct so described—i.e., the prohibited activity which subjects the defendant to criminal sanctions—is not an element of the crime which the Due Process Clause requires to be proved by the prosecution beyond a reasonable doubt. In my view, a state legislature may not dispense with the requirement of proof beyond a reasonable doubt for conduct that it targets for severe criminal penalties. Because the Pennsylvania statute challenged in this case describes conduct that the Pennsylvania Legislature obviously intended to prohibit, and because it mandates lengthy incarceration for the same, I believe that the conduct so described is an element of the criminal offense to which the proof beyond a reasonable doubt requirement applies.

. . .

It follows, I submit, that if a State provides that a specific component of a prohibited transaction shall give rise both to a special stigma and to a special punishment, that component must be treated as a 'fact necessary to constitute the crime' within the meaning of our holding in *In re Winship*.

[Id. at 96, 103, 106 S.Ct. at 2421, 2425, 91 L.Ed.2d at 83, 87.]

The Supreme Court relied on the *McMillan* majority in upholding 8 U.S.C.A. § 1326 in *Almendarez–Torres v. United States*, *supra*. That statute authorizes a prison term of up to two years for any previously deported alien who returns to the United States without special permission. Subsection (b)(2) of the statute provides that "any alien described" in subsection (a) whose initial

"deportation was subsequent to a conviction for commission of an aggravated felony ... shall be fined under such title, imprisoned not more than 20 years, or both." 8 *U.S.C.A.* § 1326(b)(2). The question in *Almendarez–Torres* was whether subsection (b)(2) defines a separate crime the elements of which—initial deportation subsequent to a conviction for commission of an aggravated felony—would have to be proved to a jury beyond a reasonable doubt, or simply authorizes an enhanced penalty. *Almendarez–Torres, supra,* 523 *U.S.* at 226, 118 *S.Ct.* at 1222, 140 *L.Ed.*2d at 357. The Court held, by a 5–4 vote, that Congress intended to set forth a sentencing factor in § 1326(b)(2), as opposed to a separate criminal offense, and that as such the factual predicate for finding application of the provision—a prior conviction of an aggravated felony—need not be found by the convicting jury. *Id.* at 235, 118 *S.Ct.* at 1226, 140 *L.Ed.*2d at 363. The majority began with an analysis of the statute's text, which did not specifically delegate the task of finding the recidivism element to the sentencing judge or jury. After considering "the statute's language, structure, subject matter, context, and history," *id.* at 228, 118 *S.Ct.* at 1223, 140 *L.Ed.*2d at 358, the Court found it "reasonably clear" that Congress "intended to set forth a sentencing factor in subsection (b)(2) and not a separate criminal offense." *Id.* at 230, 235, 118 *S.Ct.* at 1224, 1226, 140 *L.Ed.*2d at 359, 363. The majority then considered the constitutionality of § 1326(b)(2) as interpreted. Relying heavily on *McMillan,* the majority compared § 1326 with the Pennsylvania statute upheld in *McMillan* and found that § 1326 was similar in all pertinent respects to the *McMillan* statute, with the sole exception that "the circumstance that the sentencing factor at issue here (the prior conviction) triggers an increase in the maximum permissive sentence, while the sentencing factor at issue in *McMillan* triggered a mandatory minimum sentence." *Id.* at 244, 118 *S.Ct.* at 1231, 140 *L.Ed.*2d at 369. The majority concluded, however, that the penalty increase did not render § 1326 unconstitutional because (1) the sentencing factor at issue—recidivism—"is a traditional, if not the most traditional, basis for a sentencing court's increasing an offender's sentence,"

*id.* at 243–45, 118 *S.Ct.* at 1230–31, 140 *L.Ed.*2d at 368–69; (2) the difference between a permissive maximum and a mandatory minimum sentence "does not systematically, or normally, work to the disadvantage of a criminal defendant," *id.* at 245, 118 *S.Ct.* at 1231, 140 *L.Ed.*2d at 369; (3) the broad permissive sentencing range created by the statute "does not itself create significantly greater unfairness," *id.* at 246, 118 *S.Ct.* at 1232, 140 *L.Ed.*2d at 369; and (4) "the remaining *McMillan* factors support the conclusion that Congress has the constitutional power to treat the feature before us—prior conviction of an aggravated felony—as a sentencing factor for this particular offense. . . ." *Id.* at 246, 118 *S.Ct.* at 1232, 140 *L.Ed.*2d at 369–70.

Justice Scalia's dissent criticized the majority for over-reading the *McMillan* holding and for ignoring the textual ambiguity in the statute. The dissent began by recognizing that "[i]n all our prior cases bearing upon the issue . . . we confronted a criminal statute or state-court criminal ruling that unambiguously relieved the prosecution of the burden of proving a critical fact to a jury beyond a reasonable doubt." *Id.* at 248–49, 118 *S.Ct.* at 1233, 140 *L.Ed.*2d at 371 (Scalia, J., dissenting). The distinction between those statutes and § 1326, in the dissent's view, required application of the doctrine of "constitutional doubt"—"where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter.' " *Id.* at 250, 118 *S.Ct.* at 1234, 140 *L.Ed.*2d at 372 (quoting *United States ex rel. Attorney General v. Delaware & Hudson Co.,* 213 *U.S.* 366, 408, 29 *S.Ct.* 527, 536, 53 *L.Ed.* 836, 849 (1909)). The "constitutional doubt" inherent in the majority's interpretation of § 1326 arose, in the dissent's view, primarily from the fact—rejected as inconsequential by the majority—that § 1326, unlike the statute in *McMillan,* increased the available sentence rather than simply limiting the sentencing court's discretion within the sentencing range. *Id.* at 256, 118 *S.Ct.* at 1236–37, 140 *L.Ed.*2d at 377. The dissent concluded that

there was, until today's unnecessary resolution of the point, serious doubt whether the Constitution permits a defendant's sentencing exposure to be increased tenfold on the basis of a fact that is not charged, tried to a jury, and found beyond a reasonable doubt. If the Court wishes to abandon the doctrine of constitutional doubt, it should do so forthrightly, rather than by declaring certainty on a point that is clouded in doubt.

[*Id.* at 260, 118 *S.Ct.* at 1239, 140 *L.Ed.*2d at 379 (quotations omitted).]

The breadth of the Court's holding in *McMillan* reached its zenith in *Almendarez–Torres.* One year after that decision, in *Jones v. United States,* 526 *U.S.* 227, 119 *S.Ct.* 1215, 143 *L.Ed.*2d 311 (1999), the Court considered the federal carjacking statute, which then read as follows:

Whoever, possessing a firearm as defined in section 921 of this title, takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempts to do so, shall—

(1) be fined under this title or imprisoned not more than 15 years, or both,

(2) if serious bodily injury (as defined in section 1365 of this title) results, be fined under this title or imprisoned not more than 25 years, or both, and

(3) if death results, be fined under this title or imprisoned for any number of years up to life, or both.

[18 *U.S.C.A.* § 2119.]

The petitioner in *Jones* was convicted of the carjacking offense, but neither the indictment nor the District Court's jury instructions contained any reference to facts relating to the victim's injuries. *Jones, supra,* 526 *U.S.* at 227, 119 *S.Ct.* at 1216, 143 *L.Ed.*2d at 318. Jones' presentence report, however, recommended that Jones be sentenced to a twenty-five-year term in accordance with subsection (3) of the statute. The court concluded that the "serious bodily injury" factor was a sentencing factor and not an element of the offense, and imposed a twenty-five-year term after finding, by a preponderance of the evidence, that Jones caused the victim to sustain serious bodily injury. *Ibid.*

The Supreme Court reversed in a 5–4 decision. The majority, departing from the Court's approach in *Almendarez–Torres,* relied on the doctrine of constitutional doubt and construed the carjacking statute as defining three distinct offenses, rather than one offense with two sentencing factors. *Id.* at 239–40, 119 *S.Ct.* at

1222, 143 *L.Ed.*2d at 324. The Court distinguished *Almendarez–Torres* by limiting the scope of that decision to the sentencing factor of recidivism: "[t]he majority and the dissenters in *Almendarez–Torres* disagreed over the legitimacy of the Court's decision to restrict its holding to recidivism, but both sides agreed that the Court had done just that." *Id.* at 249–50 n. 10, 119 *S.Ct.* at 1227, 143 *L.Ed.*2d at 330.

Concurring, Justices Stevens and Scalia both expressed the belief that "it is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed." *Id.* at 250, 119 *S.Ct.* at 1228, 143 *L.Ed.*2d at 332 (Stevens, J., concurring).

The Supreme Court most recently considered the application of the *Winship* doctrine in the context of a sentencing statute in *Apprendi v. New Jersey, supra.* By another 5–4 vote, the Court in *Apprendi* reversed a decision of this Court and held unconstitutional the New Jersey Hate Crimes Act, *N.J.S.A.* 2C:44–3(e). That statute provided for an "extended term" of imprisonment for convictions where the trial judge found, by a preponderance of the evidence, that "[t]he defendant in committing the crime acted with a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation or ethnicity." *N.J.S.A.* 2C:44–3(e). The petitioner in *Apprendi* was convicted of a second-degree crime that normally would subject a defendant to a term of imprisonment of between five and ten years. *N.J.S.A.* 2C:43–6(a)(2). The extended term authorized by the hate crime law for a second-degree offense increased that term to between ten and twenty years. *N.J.S.A.* 2C:43–7(a)(3).

The *Apprendi* majority began its analysis with a detailed study of the historical foundation of the right to a jury trial and the reasonable doubt requirement. The majority cited case law and commentary from our English common law roots through the nineteenth century, as well as modern American jurisprudence,

and concluded that those foundational sources pointed definitively to a broad understanding of the jury trial and reasonable doubt requirements:

> The evidence we describe that punishment was, by law, tied to the offense (enabling the defendant to discern, barring pardon or clergy, his punishment from the face of the indictment), and the evidence that American judges have exercised sentencing discretion within a legally prescribed range (enabling the defendant to discern from the statute of indictment what maximum punishment under that statute could bring), point to a single, consistent conclusion: The judge's role in sentencing is constrained at its outer limits by the facts alleged in the indictment and found by the jury. Put simply, facts that expose a defendant to a punishment greater than that otherwise legally prescribed were by definition "elements" of a separate legal offense.
>
> [*Apprendi, supra*, 530 *U.S.* at —— n. 10, 120 *S.Ct.* at 2359 n. 10, 147 *L.Ed.*2d at 450–51 n.10.]

Reviewing the post-*Winship* cases in light of that historical gloss, the majority concluded that because the New Jersey hate crime law increased the defendant's maximum sentencing exposure based on a judge's finding pursuant to a preponderance of the evidence standard, the statute violated the Due Process Clause:

> If a defendant faces punishment beyond that provided by statute when an offense is committed under certain circumstances but not others, it is obvious that both the loss of liberty and the stigma attaching to the offenses are heightened; it necessarily follows that the defendant should not—at the moment the State is put to proof of those circumstances—be deprived of protections that have, until that point, unquestionably attached.
>
> . [*Id.*, at ——, 120 *S.Ct.* at 2359, 147 *L.Ed.*2d at 451.]

The majority noted specifically that its reasoning did not necessarily conflict with the narrow holdings of *McMillan* or *Almendarez–Torres,* because the statute in *McMillan* did not increase the overall maximum prison term, *id.* at ——, 120 *S.Ct.* at 2365, 147 *L.Ed.*2d at 458, and the statute in *Almendarez–Torres* dealt with the unique sentencing factor of "a prior judgment of conviction entered in a proceeding in which the defendant had the right to a jury trial and the right to require the prosecutor to prove guilt beyond a reasonable doubt...." *Id.* at ——, 120 *S.Ct.* at 2366, 147 *L.Ed.*2d at 459. However, an undeniable tension, explicitly recognized in Justice O'Connor's dissent, *id.* at ——, 120 *S.Ct.* at

2385, 147 *L.Ed.*2d at 481 (O'Connor, J., dissenting), exists between the formal distinctions drawn between the cases and the language of the *Apprendi* majority indicating that "the relevant inquiry is not one of form, but of effect-does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" *Id.* at ——, 120 *S.Ct.* at 2365, 147 *L.Ed.*2d at 457.

Recognizing that tension, the majority made explicit its reservations about the future application of *McMillan,* although it specifically avoided reconsideration of *McMillan's* holding:

> We do not overrule *McMillan.* We limit its holding to cases that do not involve the imposition of a sentence more severe than the statutory maximum for the offense established by the jury's verdict—a limitation identified in the *McMillan* opinion itself. Conscious of the likelihood that legislative decisions may have been made in reliance on *McMillan,* we reserve for another day the question whether *stare decisis* considerations preclude reconsideration of its narrower holding.
>
> [*Id.* at —— n. 13, 120 *S.Ct.* at 2361 n. 13, 147 *L.Ed.*2d at 453 n. 13.]

The majority expressed like reservations about *Almendarez–Torres:*

> Even though it is arguable that *Almendarez–Torres* was incorrectly decided, and that a logical application of our reasoning today should apply if the recidivist issue were contested, Apprendi does not contest the decision's validity and we need not revisit it for purposes of our decision today to treat the case as a narrow exception to the general rule we recalled at the outset.
>
> [*Id.* at ——, 120 *S.Ct.* at 2362, 147 *L.Ed.*2d at 454–55.]

Although the majority declined to address the continuing vitality of *McMillan* and *Almendarez–Torres,* Justice Thomas' concurrence concluded that both *McMillan* and *Almendarez–Torres* should be reversed. *Id.* at ——, 120 *S.Ct.* at 2367, 147 *L.Ed.*2d at 472 (Thomas, J., concurring) ("The consequence of the above discussion for our decisions in *Almendarez–Torres* and *McMillan* should be plain enough. . . ."). Justice Thomas began by echoing the historical analysis conducted by the majority:

> A long line of essentially uniform authority addressing accusations, and stretching from the earliest reported cases after the founding until well into the 20th century, establishes that the original understanding of which facts are elements was even broader than the rule that the Court adopts today. This authority establishes that a "crime" includes every fact that is by law a basis for imposing or increasing punishment (in contrast with a fact that mitigates punishment).

[*Id.* at ——, 120 *S.Ct.* at 2368, 147 *L.Ed.*2d at 461 (Thomas, J., concurring).]

Considering *McMillan* in light of those common-law roots, the concurrence found it "clear that the common-law rule would cover the *McMillan* situation of a mandatory-minimum sentence":

No doubt a defendant could, under such a scheme, find himself sentenced to the same term to which he could have been sentenced absent the mandatory minimum. The range for his underlying crime could be 0 to 10 years, with the mandatory minimum of 5 years, and he could be sentenced to 7. (Of course, a similar scenario is possible with an increased maximum.) But it is equally true that his expected punishment has increased as a result of the narrowed range and that the prosecution is empowered, by invoking the mandatory minimum, to require the judge to impose a higher punishment than he might wish. The mandatory minimum entitles the government to more than it would otherwise be entitled (5 to 10 years, rather than 0 to 10 years and the risk of a sentence below 5). Thus, the fact triggering the mandatory minimum is part of the punishment sought to be inflicted; it undoubtedly enters into the punishment so as to aggravate it, and it is an act to which the law affixes punishment.

[*Id.* at ——, 120 *S.Ct.* at 2379, 147 *L.Ed.*2d at 474 (Thomas, J., concurring) (citations and quotations omitted).]

## B

As noted, NERA imposes a mandatory minimum prison term of 85% of the overall sentence, and a mandatory three- to five-year period of post-release parole supervision, for any first- or second-degree conviction that is found to constitute a violent crime. The sentencing court interpreted NERA to empower the court, as opposed to a jury, to make the factual determination of whether Johnson's underlying conduct in his convictions constituted violent crime within the meaning of the Act. The text of NERA does not specifically delegate that responsibility. Subsection (e) of the Act provides that

[a] court shall not impose sentence pursuant to this section unless the ground therefor has been established at a hearing after the conviction of the defendant and on written notice to him of the ground proposed. The defendant shall have the right to hear and controvert the evidence against him and to offer evidence upon the issue.

[*N.J.S.A.* 2C:43–7.2(e).]

Thus, NERA simply requires that the NERA factor be established at a hearing after the defendant's conviction, without speci-

fying either whether the hearing is before the judge or the jury, or the applicable standard of proof.

The language of subsection (e) stands in stark contrast to that of the Pennsylvania statute upheld in *McMillan*, the text of which specifically delegated to the sentencing court, by a preponderance of the evidence standard, the determination of whether a defendant "visibly possessed a firearm" in the underlying conviction:

Provisions of this section shall not be an element of the crime and notice thereof to the defendant shall not be required prior to conviction, but reasonable notice of the Commonwealth's intention to proceed under this section shall be provided after conviction and before sentencing. The applicability of this section shall be determined at sentencing. The court shall consider any evidence presented at trial and shall afford the Commonwealth and the defendant an opportunity to present any additional evidence and shall determine, by a preponderance of the evidence, if the section is applicable.

[42 *Pa. Cons.Stat.* § 9712(b).]

Therefore, unlike *McMillan*, and as in *Jones*, we are presented not—as the parties suggest—with a direct constitutional question, but rather with a question of statutory interpretation that, depending on how we interpret subsection (e) of NERA, could raise constitutional concerns. If we interpret subsection (e) to require a jury to make the "violent crime" finding beyond a reasonable doubt, we will have allayed any concern that NERA violates the *Winship* doctrine.

 We have adopted in our jurisprudence a cognate of the "constitutional doubt" doctrine applied by the dissent in *Almendarez–Torres* and the majority in *Jones*. "Unless compelled to do otherwise, courts seek to avoid a statutory interpretation that might give rise to serious constitutional questions." *Silverman v. Berkson*, 141 *N.J.* 412, 416, 661 *A.*2d 1266 (1995). "Under New Jersey law, a challenged statute will be construed to avoid constitutional defects if the statute is reasonably susceptible of such construction." *State Bd. of Higher Ed. v. Bd. of Dir. of Shelton College*, 90 *N.J.* 470, 478, 448 *A.*2d 988 (1982). The power and obligation inherent in this State's constitutional doubt doctrine "begins with the assumption that the legislature intended to act in

a constitutional manner." *Right to Choose v. Byrne,* 91 *N.J.* 287, 311, 450 *A.*2d 925 (1982).

Johnson makes strenuous efforts to distinguish NERA from the Pennsylvania statute upheld in *McMillan.* We find it unnecessary, however, to reach that issue, because we infer that the continuing vitality of *McMillan* itself may be in question. As noted, both the principal concurrence and dissent in *Apprendi* (representing collectively a majority of Justices) construed the majority opinion as mandating reversal of *McMillan* and invalidation of the mandatory minimum statutes in the mold of the Pennsylvania law. *Apprendi, supra,* 530 *U.S.* at ——, 120 *S.Ct.* at 2379, 147 *L.Ed.*2d at 472 (Thomas, J., concurring); 530 *U.S.* at ——, 120 *S.Ct.* at 2385, 147 *L.Ed.*2d at 481 (O'Connor, J., dissenting) ("[I]t is incumbent on the Court not only to admit that it is overruling *McMillan,* but also to explain why such a course of action is appropriate under normal principles of *stare decisis.*"). The *Apprendi* majority explicitly reserved that question for an occasion when the issue would be squarely presented to the Court. *Id.* at —— n. 13, 120 *S.Ct.* at 2361 n. 13, 147 *L.Ed.*2d at 453 n. 13.

The sentiments expressed in *Apprendi* about the actual effect of a sentence are reinforced by the laws and jurisprudence of this State. Concededly, a NERA sentence does not impose an increased maximum prison sentence beyond that otherwise available under the Criminal Code. However, "we have always recognized that real time is the realistic and practical measure of the punishment imposed." *State v. Mosley,* 335 *N.J.Super.* 144, 157, 761 *A.*2d 130 (App.Div.2000). *See also State v. Pennington,* 154 *N.J.* 344, 357, 712 *A.*2d 1133 (1998) (noting that, pursuant to *N.J.S.A.* 2C:44–1c(2), "a sentencing court is required to consider parole consequences in sentencing"); *State v. Kovack,* 91 *N.J.* 476, 482, 453 *A.*2d 521 (1982) ("Under the New Jersey Code of Criminal Justice the parole ineligibility is the backbone of the sentence."); *State v. Maguire,* 84 *N.J.* 508, 530, 423 *A.*2d 294 (1980) ("The reality stressed by [defendants and amicus] is the duration of a sentence, but we suggest that the ultimate reality is the period of

actual imprisonment."); *State v. Richardson,* 208 *N.J.Super.* 399, 413–14, 506 *A.*2d 43 (App.Div.), *certif. denied,* 105 *N.J.* 552, 523 *A.*2d 188 (1986) ("[T]he period of actual imprisonment before being released on parole is the real sentence."). Indeed, our rules of criminal practice require the court at the time of sentencing to state the real time probable as the result of the sentence imposed, including not only the defendant's primary eligibility date but also the impact of credits against the sentence. *R.* 3:21–4(j).

Understood in that context, the "punishment" imposed by NERA could be more severe than the punishment imposed by the hate crimes law held unconstitutional in *Apprendi.* A second-degree offender under the hate crimes law would be subject to a ten- to twenty-year term, rather than the normal five- to ten-year term. *N.J.S.A.* 2C:43–6(a)(2). In *Apprendi,* the Law Division sentenced the petitioner, a second-degree offender, to a twelve-year term with a four-year parole disqualifier. *State v. Apprendi, supra,* 159 *N.J.* at 11, 731 *A.*2d 485. In contrast, a second-degree NERA offender is subject to a presumptive term of seven years, *N.J.S.A.* 2C:44–1(f), but under NERA would face a mandatory parole disqualifier of almost six years, or nearly two years greater than the mandatory-minimum sentence received by the petitioner in *Apprendi.* That a typical mandatory sentence imposed for a second-degree offender under the statute held unconstitutional in *Apprendi* could be less than the sentence mandated for a like offender under *NERA* provides force to the contention that the application of NERA could be understood to require *Winship* protections. That argument is bolstered by the fact that other statutes in the Code imposing mandatory parole ineligibility terms allow the sentencing court some leeway in determining the mandatory minimum period, *see, e.g., N.J.S.A.* 2C:11–5(b)(1), 2C:14–6, 2C:20–11(c), 2C:43–6(c), whereas NERA affords no discretion-the minimum term is simply 85% of the base term, regardless of specific circumstances in the record that might otherwise indicate the imposition of a lower term.

Beyond the punishment factor, the Supreme Court in *Apprendi* also noted the elemental nature of the sentencing factor in that case: "It is as clear as day that this hate crime law defines a particular kind of prohibited *intent*, and a particular intent is more often than not the *sine qua non* of a violation of a criminal law." *Apprendi, supra,* —— *U.S.* at —— n. 18, 120 *S.Ct.* at 2364 n. 18, 147 *L.Ed.*2d at 457 n. 18. Such is also the case here. As the Appellate Division noted in *Mosley, supra,* NERA

> does not address the circumstances surrounding the commission of a crime, *i.e.,* firearm possession or use, but, rather, particularly well-understood and statutorily defined elements of a crime.... In the case of NERA offenses, there is already a statutory crime to fit the punishment intended by NERA. That is to say, if a predicate fact of NERA sentencing exists, it will also inevitably constitute or be encompassed by an element of a crime with whose commission defendant may be charged.
>
> [*Mosley, supra,* 335 *N.J.Super.* at 151–52, 761 *A.*2d 130.1]

Like the Court in *Apprendi,* we find fundamental constitutional concerns with the notion that a prosecutor could use a judicial hearing under subsection (e) of NERA to shift to the trial court the burden of finding predicate facts chargeable as elements of crimes in our criminal statutes. Interpreting subsection (e) to require *Winship* protections alleviates that concern as well.

 Because of the uncertainty expressed by the U.S. Supreme Court respecting the continuing vitality of *McMillan,* and the broad understanding of "punishment" recognized by this Court, we will construe subsection (e) of NERA to require that the "violent crime" condition must be submitted to a jury and found beyond a reasonable doubt.[2] To do otherwise would be to subject

---

1 In *Mosley,* the Appellate Division interpreted subsection (e) of NERA narrowly, in light of constitutional concerns, to permit the trial judge to find a NERA factor only in cases where the underlying criminal conviction contains an element corollary, but not precisely corresponding, to the NERA factor. *Mosley, supra,* 335 *N.J.Super.* at 151–57, 761 *A.*2d 130. We have interpreted NERA differently, but application of our holding to *Mosley* would result in the same ˆ disposition as that ordered by the Appellate Division, specifically, resentencing without reference to NERA.

2 The *Apprendi* Court specifically declined to address a constitutional claim "based on the omission of any reference to sentencing enhancement or racial

NERA to constitutional challenge. We are confident that the Legislature would far prefer our construction of NERA to its potential invalidation under the Due Process Clause.

We acknowledge that our Criminal Code contains other provisions that, like NERA, increase mandatory minimum terms based on factual predicates found by the sentencing judge. Any questions concerning the validity of those statutes are not before us. Our disposition also renders it unnecessary for us to address Johnson's argument that subsection (c) of NERA, which imposes a mandatory three- to five-year period of post-release parole supervision, constitutes an increase in the overall maximum term and therefore violates the narrow holding of *Apprendi*. Johnson does not raise, and we therefore do not consider, any other potential challenges to subsection (c).

■ We find that the factual predicate for a NERA sentence must be found by a jury under the "beyond a reasonable doubt" standard. We solicit the recommendation of our Criminal Practice Committee concerning appropriate procedures, including a NERA jury charge, that will satisfy the requirements of subsection (e) of NERA as thus construed. We also invite the Criminal Practice Committee to consider whether *R.* 3:21–4(f) should be amended to require notice by the prosecutor of intent to impose a NERA

---

bias in the indictment." *Apprendi, supra,* 530 *U.S.* at —— n. 3, 120 *S.Ct.* at 2356 n. 3, 147 *L.Ed.*2d at 447 n. 3. That is because, the Court noted, the federal Fifth Amendment right to presentment or indictment of a grand jury has not been selectively incorporated into the Fourteenth Amendment as a fundamental right applicable to the individual states. *Branzburg v. Hayes,* 408 *U.S.* 665, 688 n. 25, 92 *S.Ct.* 2646, 2660, 33 *L.Ed.*2d 626, 649 (1972). The New Jersey Constitution contains an identical indictment clause. *N.J. Const.* art. I, par. 8 ("No person shall be held to answer for a criminal offense, unless on the presentment or indictment of a grand jury. . . ."). We need not address here, however, whether the indictment requirement attaches to NERA. The count of the indictment charging Johnson with the August 8 robbery alleged that Johnson, "in the course of a theft, did threaten immediate bodily injury [to the victim], and/or did put [the victim] in fear of immediate bodily injury while armed with and/or threatening the immediate use of a deadly weapon." We are satisfied that the indictment placed Johnson on sufficient notice of the NERA violent crime predicate.

sentence earlier than fourteen days after a guilty plea or return of the verdict.

## C

■ Notwithstanding the construction of NERA that we adopt today, we are satisfied that Johnson's jury did, in fact, find the NERA violent crime predicate in reaching its verdict, and we therefore decline to reverse Johnson's sentence.

At the sentencing hearing, the State argued that Johnson was eligible for sentencing under NERA as a result of his first-degree robbery conviction. The robbery statute provides:

A person is guilty of robbery if, in the course of committing a theft, he:

(1) inflicts bodily injury or uses force upon another; or

(2) threatens another with or purposely puts him in fear of immediate bodily injury; or

(3) commits or threatens immediately to commit any crime of the first or second degree.

. . .

Robbery is a crime of the second degree, except that it is a crime of the first degree if in the course of committing the theft the actor attempts to kill anyone, or purposely inflicts or attempts to inflict serious bodily injury, or is armed with, or uses or threatens the immediate use of a deadly weapon.

[*N.J.S.A.* 2C:15–1.]

■ The trial court's charge to the jury in the August 8 trial followed the statute:

Under the law, a person is … guilty of armed robbery if in the course of committing a theft, he threatens another with or purposely puts the other person in fear of immediate bodily injury and during the course of that was armed with or threatened the immediate use of a deadly weapon. So that in order for you to find the defendant guilty of the crime of armed robbery, the State has to prove beyond a reasonable doubt each of the following elements: First, that the defendant was in the course of committing a theft. Second, that while in the course of committing that theft, the defendant threatened the victim with or purposely put her in fear of immediate bodily injury and that during the course thereof, the defendant was armed with or threatened the immediate use of a deadly weapon.

As noted, NERA defines "violent crime" as, for present purposes, any crime in which the actor "uses or threatens the immediate use of a deadly weapon." *N.J.S.A.* 2C:43–7.2(d). Thus, the elements of the NERA "violent crime" factor do not overlap completely with

the elements of first-degree robbery, because a defendant could be convicted of first-degree robbery where the defendant threatens the victim and is armed with a deadly weapon but does not threaten the victim *with* the deadly weapon.

The only witness to the August 8 robbery who testified at trial was the victim, and she testified on both direct and cross examination that Johnson aimed the BB gun at her. That testimony was uncontradicted by any other evidence at trial. Thus, in view of the evidence adduced at trial, the only conceivable conclusion that Johnson's jury could have reached in finding Johnson guilty of first-degree robbery was that Johnson threatened the victim with the BB gun in the process of robbing her. Accordingly, notwithstanding the fact that the trial court failed to specifically instruct the jury to find the NERA violent crime predicate, we affirm Johnson's sentence because the facts adduced at trial establish that the jury made that finding beyond a reasonable doubt.

## D

 The question remains whether our construction of NERA should be applied prospectively or retroactively. We discussed the prospective-retroactive application doctrine at length in *State v. Knight*, 145 *N.J.* 233, 248–61, 678 *A.*2d 642 (1996). As we noted in *Knight,* the prospective-retroactive inquiry involves two steps. First, we ask whether the decision constitutes a "new rule," that is, whether it " 'breaks new ground or imposes a new obligation on the State or the Federal Government ... [or] if the result was not dictated by precedent existing at the time the defendant's conviction became final.' " *Id.* at 250–51, 678 *A.*2d 642 (quoting *Teague v. Lane,* 489 *U.S.* 288, 301, 109 *S.Ct.* 1060, 1070, 103 *L.Ed.*2d 334, 349 (1989)). If a decision indeed sets forth a "new rule," three factors generally are considered by this Court to determine whether the rule is to be applied retroactively: " '(1) the purpose of the rule and whether it would be furthered by a retroactive application, (2) the degree of reliance placed on the old rule by those who administered it, and (3) the effect a retroactive

application would have on the administration of justice.'" *Id.* at 251, 678 *A.*2d at 651–52 (quoting *State v. Nash,* 64 *N.J.* 464, 471, 317 *A.*2d 689 (1974)).

We find that our construction of NERA, insofar as it is based on a new understanding of the *Winship* doctrine as expressed in *Apprendi, supra,* constitutes a "new rule" for purposes of our jurisprudence. We decline, however, to apply that rule retroactively, for two essential reasons. First, "we generally have avoided applying new rules retroactively when such an application would undermine the validity of a large number of convictions." *Knight, supra,* 145 *N.J.* at 252, 678 *A.*2d 642. Retroactive application of today's ruling could result in post-conviction petitions from a large number of inmates currently serving NERA sentences. In the vast majority of those cases, a jury deliberation on the violent crime issue would not be likely to produce a result different from the challenged court finding, and the original sentences would be reaffirmed. The review process, however, would impose an "unjustified burden[ ]," *ibid.,* on the criminal justice system that it need not bear.

Second, we emphasize that our decision today rests on a theory of statutory interpretation, not on principles of constitutional law. Consequently, prospective application will not, under this ruling, deprive NERA-sentenced inmates of any constitutional right established in a holding of this Court or the United States Supreme Court.

Accordingly, we will apply the rule we have announced today to the case at bar, to all cases on direct appeal on the date of this opinion where the appellant is challenging the failure of the NERA offense to be proven to a jury beyond a reasonable doubt, and to trials of cases in which NERA is implicated that commence after the filing date of this opinion.

### III

 Johnson also contends that the mandatory minimums imposed by NERA violate the Cruel and Unusual Punishment

Clause of the Eighth Amendment to the U.S. Constitution and the corresponding provision in Article I, paragraph 12 of the New Jersey Constitution. *U.S. Const.* amends. VIII, XIV; *N.J. Const.* art. I, par. 12.

 We have developed a three-part test for determining whether a criminal penalty constitutes cruel and unusual punishment. *State v. Maldonado,* 137 *N.J.* 536, 556, 645 *A.*2d 1165 (1994). We consider, first, whether the punishment conforms with contemporary standards of decency; second, whether the punishment is grossly disproportionate to the offense; and third, whether the punishment goes beyond what is necessary to accomplish any legitimate penological objective. *Ibid.* Absent a substantial showing that the statute violates those principles, the judiciary must respect the legislative will and enforce the punishment. *State v. Hampton,* 61 *N.J.* 250, 274, 294 *A.*2d 23 (1972).

We find it apparent that NERA survives Eighth Amendment scrutiny. At least twenty-seven other States and the District of Columbia have enacted legislation similar to NERA. *Bureau of U.S. Statistics, U.S. Dep't of Justice Special Report: Truth in Sentencing in State Prisons* at 2 (Jan.1999). When challenged, those laws have survived constitutional scrutiny. *See State v. Lara,* 580 *N.W.*2d 783 (Iowa), *cert. denied,* 525 *U.S.* 1007, 119 *S.Ct.* 523, 142 *L.Ed.*2d 434 (1998); *State v. Williams,* 936 *S.W.*2d 828 (Mo.Ct.App.1996). In addition, statutes imposing severe penalties have been enacted in New Jersey and upheld by this Court. *See State v. Oliver,* 162 *N.J.* 580, 745 *A.*2d 1165 (2000) (holding that sentencing under Three Strikes Law, *N.J.S.A.* 2C:43–7.1(a), does not constitute cruel and unusual punishment); *Maldonado, supra,* 137 *N.J.* at 556–60, 645 *A.*2d 1165 (upholding *N.J.S.A.* 2C:35–9, which imposes strict liability on manufacturers and distributors of certain controlled dangerous substances when death results from ingestion of those substances); *State v. Des Marets,* 92 *N.J.* 62, 82, 455 *A.*2d 1074 (1983) (holding that sentencing under Graves Act, *N.J.S.A.* 2C:44–3, does not constitute cruel and unusual punishment). The punishments imposed by NERA neither run afoul of

objective standards of decency, nor are they grossly disproportionate to the violent crime that NERA punishes. It is equally clear that the Legislature's objective of increasing the punitive consequences of violent crime as defined by NERA is a valid and legitimate one.

## IV

In summary, we interpret subsection (e) of NERA to require that a jury determine, beyond a reasonable doubt, that a defendant committed a violent crime within the meaning of NERA before a sentencing court may impose the statute's mandatory minimum sentencing structure. On this record, however, we are satisfied that Johnson received all of the protections due to him under our interpretation of the Act. We also hold that NERA does not constitute cruel and unusual punishment under the New Jersey and U.S. Constitutions.

Accordingly, as modified, we affirm the judgment of the Appellate Division.

*For affirmance as modified*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, LaVECCHIA and ZAZZALI—6.

*Opposed*—None.