788 A.2d 812 (2002)
346 N.J. Super. 521
STATE of New Jersey, Plaintiff-Respondent,
v.
Jamar WATSON, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted October 30, 2001.
Decided January 17, 2002.
*813 Peter A. Garcia, Acting Public Defender, attorney for appellant (Robert Brigliadoro, Designated Counsel, on the brief).
William H. Schmidt, Bergen County Prosecutor, attorney for respondent (Annmarie Cozzi, Assistant Prosecutor, of counsel and on the brief).
Before Judges STERN, LINTNER and PARKER.
The opinion of the court was delivered by STERN, P.J.A.D.
State v. Johnson, 166 N.J. 523, 766 A.2d 1126 (2001), held that a jury must decide, by proof beyond a reasonable doubt, factors which relate to a mandatory parole ineligibility term under the No Early Release Act ("NERA"). In this case we must decide the application of Johnson to the Graves Act, N.J.S.A. 2C:43-6c.[1]Johnson's holding was a matter of statutory interpretation, based on concerns flowing from Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S.Ct. 2348, 2362-63, 147 L.Ed.2d 435, 455 (2000), which held that a jury must decide sentencing factors, other than the fact of prior convictions, when a sentence maximum can be enhanced. Apprendi did not overrule McMillan v. Pennsylvania, 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986), which upheld a judge-imposed parole disqualifier like those required by NERA and the Graves Act. Given our Supreme Court holdings construing and upholding the constitutionality of the Graves Act, including our Supreme Court's references to those Graves Act cases in its Apprendi opinion, we affirm this conviction. However, as we hereinafter develop, we urge trial judges to try all Graves Act cases as if Johnson applied until the Supreme Court reviews the issue.

I.
Defendant and co-defendant William Chalmers were indicted for possession of "a 9 mm Parabellum (Luger) Browning Arms Company semi-automatic pistol ... with the purpose to use it unlawfully against the person or property of another," N.J.S.A. 2C:39-4a (count one), possession of hollow nose bullets, N.J.S.A. 2C:39-3f (count two), and possession of the "9 millimeter semi-automatic pistol and a .177 pellet BB caliber Marksman Spring Air pistol" without a permit, N.J.S.A. 2C:39-5b (counts three and four).
At the motion to suppress the trial judge concluded that co-defendant Chalmers' "statements made at the scene [of the stop *814 of the Jeep defendant was driving] are admissible [because] he was not in custody at the time," but that defendants' statements once placed into custody "cuffed [and] brought to headquarters" were inadmissible. The judge further ruled that items found in and near a black duffel bag at a location where Chalmers and the Jeep were observed shortly before the stop were admissible. The judge also ruled that rubber gloves found in the glove compartment of the vehicle after the stop were admissible because defendant advised the police that "his credentials were in the glove compartment." However, the judge suppressed the BB gun because it was found in the vehicle during an "inventory" of the car two and-a-half weeks after the arrest without a warrant or "exigent circumstances." The judge thereafter dismissed count four as the BB gun had been suppressed.
Following a jury trial, both defendants were convicted on counts one and three. They were found not guilty on count two. In the special verdict with respect to count one, the jury found defendant guilty of:
knowingly and unlawfully possess[ing] a certain weapon, to wit: a 9 mm Parabellum (Luger) Browning Arms Company semi-automatic pistol, serial number 245NM22731, with the purpose to use it unlawfully against the person or property of another....
After defendant's motion for a new trial was denied, the trial judge found that the proofs established that "[d]efendants possessed the handgun with the purpose to utilize it in restraining [a security guard at Chalmers' place of former employment near where he and the vehicle were first observed]" and that "the firearm was intended to be used against a person." Therefore, defendant was sentenced on count one pursuant to the Graves Act, N.J.S.A. 2C:43-6c. The judge also declined to refer the case to the Assignment Judge for an "escape valve" hearing, pursuant to N.J.S.A. 2C:43-6.2.
Defendant was sentenced to five years in the custody of the Commissioner of Corrections on count one, with three years to be served before parole eligibility. A concurrent three year term was imposed on count three. The Assignment Judge subsequently denied defendant's motion to find that the prosecutor abused his discretion by not moving for waiver of the mandatory Graves Act sentence.
Defendant appeals to us and argues:
POINT I THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AS A). THE STOP OF THE DEFENDANT'S VEHICLE IN THIS CASE WAS INVALID[;] B). THE WARRANTLESS SEARCH OF THE MOTOR VEHICLE WAS INVALID AND THE STATE FAILED TO ESTABLISH ANY CONNECTION BETWEEN THE ITEMS FOUND AT THE SCENE AND THE DEFENDANT.
A). The trial court erred in denying defendant's motion to suppress evidence as the stop of the motor vehicle in this case was invalid
B). The warrantless search of the motor vehicle was invalid and the State failed to establish any connection between the items found at the scene and the defendant
POINT II THE TRIAL COURT ERRED IN ALLOWING INTO EVIDENCE THE STATEMENTS MADE AT THE SCENE BY THE DEFENDANTS AS THEY WERE NEVER ADVISED OF THEIR MIRANDA RIGHTS
POINT III THE TRIAL COURT'S DENIAL OF DEFENDANT'S REQUEST *815 FOR A WADE HEARING AMOUNTED TO AN ABUSE OF DISCRETION AS THE DEFENDANT DID PROFFER EVIDENCE OF IMPERMISSIBLE SUGGESTIVITY
POINT IV THE TRIAL JUDGE ERRED IN DENYING DEFENDANT'S MOTION TO DISMISS THE INDICTMENT AS THERE WAS NO EVIDENCE WHATSOEVER THAT DEFENDANT POSSESSED A WEAPON AND THAT HE POSSESSED A WEAPON FOR AN UNLAWFUL PURPOSE
POINT V THE TRIAL COURT'S FAILURE TO INSTRUCT THE JURY ADEQUATELY WITH RESPECT TO FLIGHT DEPRIVED THE DEFENDANT OF DUE PROCESS OF LAW. (U.S. CONST. AMEND. XIV; N.J. CONST. ART. I, PAR. 1)
POINT VI THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL MADE AT THE END OF THE STATE'S CASE BECAUSE THE STATE FAILED TO ESTABLISH A PRIMA FACIE CASE WITH RESPECT TO THESE CHARGES
POINT VII THE TRIAL JUDGE ERRED IN DENYING DEFENDANT'S MOTION FOR A NEW TRIAL AS THE JURY VERDICT IN THIS MATTER WAS AGAINST THE WEIGHT OF THE EVIDENCE
POINT VIII THE TRIAL COURT ERRED IN
A). DETERMINING THAT THE GRAVES ACT APPLIED IN THIS CASE;
B). DENYING DEFENDANT'S GRAVES ACT "ESCAPE VALVE" APPLICATION;
C). DENYING DEFENDANT'S REQUEST TO BE GIVEN A NON-CUSTODIAL SENTENCE PURSUANT TO N.J.S.A. 2C:44-1(D);
D). FAILING TO SENTENCE DEFENDANT TO A TERM OF IMPRISONMENT APPROPRIATE TO ONE DEGREE LOWER THAN HIS SECOND DEGREE CONVICTION
We also asked the parties to brief whether State v. Johnson applies to proceedings under the Graves Act and in his supplemental brief, defendant argues:
BEFORE THE DEFENDANT COULD BE SENTENCED PURSUANT TO THE GRAVES ACT, HE WAS ENTITLED TO HAVE THE JURY DETERMINE BEYOND A REASONABLE DOUBT THAT HE POSSESSED A HANDGUN WITH THE PURPOSE TO USE IT AGAINST ANOTHER PERSON
Our careful review of the record convinces us that reversal is not required and that only the following discussion is warranted in this opinion. R. 2:11-3(e)(2). We address the issue we asked the parties to brief.

II.
At about 4:45 a.m. on Saturday, July 20, 1996, while patrolling in the industrial area of Moonachie Avenue and Empire Boulevard, Sergeant Ronald DeNichilo of the Moonachie Police noticed someone standing near a telephone pole. As he drove closer, he saw a male, later identified as co-defendant Chalmers, "adjusting ... the front of his pants." DeNichilo was able to see Chalmers' face clearly and noticed that he was wearing dark clothes.
*816 The presence of this individual struck Sergeant DeNichilo as "very odd" because the area was mostly industrial and it was very early in the morning. DeNichilo was also aware of the fact that the nearby Burger King had been burglarized "at least three or four times" at this time of day. Therefore, DeNichilo drove into the Burger King parking lot to check the drive-in window.
While Sergeant DeNichilo was driving around the Burger King parking lot, he noticed that Chalmers was walking very fast across a grassy area and into a parking lot at 250 Moonachie Avenue. DeNichilo also noticed a black duffel bag on the ground near the telephone pole where he first observed Chalmers. DeNichilo stopped the patrol car and looked inside the bag with a flashlight. He found two rolls of silver duct tape, a pair of standard pliers, a black ski-type full face mask and latex gloves. DeNichilo also noticed a loaded "9 millimeter automatic weapon" "underneath the bag" "cocked, ready to be fired."
After calling headquarters for assistance, DeNichilo noticed a white Jeep pull out of the parking lot of 250 Moonachie Road at a "very fast" rate of speed, disregard a stop sign and make an illegal left hand turn. The sergeant then radioed Officer Schmidt, described the Jeep and its direction of travel, and asked him to stop the vehicle. Schmidt stopped the Jeep and so advised DeNichilo by radio.
DeNichilo proceeded to the scene of the stop and spoke with defendant, who had been driving the vehicle. DeNichilo asked Watson what he had been doing in the area of 250 Moonachie Road. Watson explained that he "stopped to let his friend take a piss." The Sergeant then asked who owned the black bag, and Watson answered "what black bag?" In the meantime, Chalmers advised Schmidt that he and defendant had been at a "wheel[ie]" contest in New York City, and they then had stopped at a White Castle restaurant on Route 17 in Hasbrouck Heights on the way back from the city.
Chalmers and defendant were then transported to Moonachie Police Headquarters for additional questioning. They were handcuffed in accordance with department transport policy, but were not under arrest. While the defendant and Chalmers were at headquarters, DeNichilo returned to the area where he had first seen Chalmers. DeNichilo walked around the area and discovered a ski mask in a "tree lined area" between 245 and 250 Moonachie Road. He also found another black bag containing an empty "green army type duffle bag" and an empty large black bag. In addition, he found two latex gloves that appeared to have been worn.
Sergeant DeNichilo then went back to headquarters and was advised by Officer Schmidt that defendant had indicated that his "identification" was in the Jeep. DeNichilo thereafter opened the glove compartment of the Jeep, which had been transferred to the Moonachie Police Headquarters by tow truck. The Sergeant found another two pairs of latex gloves inside the glove compartment. He then went with Chief McGahn and walked the path Chalmers had taken when he was first observed, and found another latex glove.
In the interim while an "inventory" was being made of Chalmers' property before he was placed in a cell at headquarters, Schmidt discovered Chalmers' "time card" and pay stubs from the Overnight Transportation Company, for the period through July 13, 1996. Moreover, Sergeant Michael Maguire, who patrolled the area near the Overnight Transportation Company which bordered the Burger King, found a flashlight and a latex glove "between the *817 Overnight [Transportation Company] property fence and the Burger King property."
Chalmers was terminated by Overnight Transport on July 19, 1996. Coni Palumbo, the company's Assistant Manager, testified that he was terminated that day for failure to appear for work or call in. She further testified that, generally after 1:30 a.m. on a Saturday morning, the security guard is "the only person" at the facility.
No fingerprints were detected on the gun. However, Frank McLeod testified that he sold the gun to someone he had known for approximately seven years as "Balil." McLeod identified defendant as the person named "Balil."
Joyce Ann Polyniak, a forensic scientist at the State Police Laboratory, examined the gloves retrieved from the scene. She compared the gloves found in the black bag to the gloves found in the Jeep and concluded that they were similar in terms of size, color and thickness. She also compared the gloves Sergeant DeNichilo found in the tree-lined area between 245 and 250 Moonachie Road near the second duffel bag, the glove he found on the path that Chalmers had walked, and the glove found by Officer Maguire. One of the gloves found by the sergeant near the second duffel bag was similar to the gloves found in the Jeep and in the first black bag. The other glove found by the sergeant near the second duffel bag as well as the glove found by Officer Maguire and the glove found on the path where Chalmers had walked were not.
Defendant testified in his own behalf and denied that he ever purchased a gun from McLeod. He claimed that the first time he saw the 9 millimeter gun was in the courtroom. He also denied possessing the hollow nosed bullets, gloves, mask or other objects found. He further testified that he did not see Chalmers take anything out of the Jeep and did not see a duffel bag on the ground near Chalmers. Defendant also stated that Chalmers was on a "fen-phen" diet "that made him go to the bathroom a lot."
Co-defendant Chalmers did not testify.
The trial judge well summarized the State's case in properly denying defendant's motion for a new trial:
In this case the evidence presented at the trial clearly corroborated the State's position and the jury verdict was not against the weight of the evidence for several reasons.
First, there was sufficient evidence presented which demonstrated that the semi-automatic handgun that was recovered belonged to the Defendant, and the prosecutor just stated the history of the weapon, that it was sold to Mr. Watson.
....
Second, when the Defendant was apprehended he was clad in black, and was in possession [constructive or as an accomplice] of a duffel bag containing duct tape, latex gloves and two full faced ski masks.
Finally, at the time this incident occurred the Defendants had just, the Codefendant had just recently been terminated as an employee of the Overnight Transportation Company and was familiar with the inner working of the company's operations.
....
... It's early in the morning. Desolate area. Nobody around but a Codefendant standing over a bag, in the same area of the bag with the gun. The gun was under the bag. The duct tape. There were latex gloves and ski masks.
It is clear the Defendants were in possession of those items and the jury found their purpose was to commit a *818 crime at Overnight Transportation Company.

III.
Defendant contends that the trial judge erred in determining that the Graves Act applies in this case when the judge found that defendant intended to use the firearm against a security guard. See State v. Camacho, 153 N.J. 54, 72-73, 707 A.2d 455, cert. denied, 525 U.S. 864, 119 S.Ct. 153, 142 L.Ed.2d 125 (1998). The trial judge concluded as follows:
Intent to use the weapon is not necessary to prove possession, only mere possession is required. State v. DesMarets, 92 N.J. 62, 67, 68-70, 455 A.2d 1074 (1983).
The Graves Act even applies in situations where a defendant is only in constructive possession of a weapon, but is able to practically immediately convert it into actual possession. State v. Stewart, 96 N.J. 596, 477 A.2d 300 (1984).
Codefendants need only share the purpose to possess a gun. State v. Wooters, 228 N.J.Super. 171, 175-179, 549 A.2d 441 (App.Div.1988).
Furthermore, an unharmed accomplice is liable under the Graves Act if he knew or had reason to know that the codefendant was armed. State v. Mancine, 124 N.J. 232, 260, 590 A.2d 1107 (1991); and State v. White, 98 N.J. 122, 484 A.2d 691 (1984).
If[,] after [a] hearing[,] the judge determine[s] that the Graves Act is applicable, he is mandated to sentence the defendant to a minimum term of one-third to one-half of the maximum or three years, whichever is greater.
Now, this Court has had the opportunity to review the briefs, the defense counsel's brief, the prosecutor's brief, to review the trial notes, the presentence investigation report and all the documents in the file, the evidence, and determines that the State has satisfied the requirements of the Graves Act, and demonstrated by a preponderance of the evidence that the Defendants possessed the handgun with the purpose to utilize it in restraining an Overnight Transport[ation] Security Guard who had been patrolling the yard on the night the Defendants were intending to commit a robbery therein.
There is no question that the gun that was recovered is a firearm.
Therefore, the lone issue is whether the firearm was intended to be used against a person. Based on the evidence presented it clearly was.
This finding is supported by the fact that when the gun was found the police also found a duffel bag laying on top of the gun, which contained ski masks, and gloves and two rolls of duct tape.
From these factors[,] it can be inferred that the Defendants, one of which was a former employee of Overnight, who had at the time only recently been terminated, did intend to gain access to the Overnight Transport[ation] Company by approaching the security guard at gunpoint, or otherwise, having the gun in his possession and using the weapon to restrain the guard and also restraining him with the duct tape.
Therefore, the Court finds that the Graves Act applies. It is applicable in this case.
We add that as the firearm was found abandoned in a grassy area with objects in a bag which could be used to implement a robbery of the co-defendant's former employer, application of the Graves Act survives irrespective of any alleged error regarding the motion to suppress items taken from the car.

*819 A.
Apprendi v. New Jersey, 530 U.S. 466, 476, 120 S.Ct. 2348, 2355, 147 L.Ed.2d 435, 446 (2000), applied the rule of Jones v. United States, 526 U.S. 227, 243 n. 6, 119 S.Ct. 1215, 1224, 143 L.Ed.2d 311, 326 (1999), to a state statute, and held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."[2] 530 U.S. at 490, 120 S.Ct. at 2362-63, 147 L.Ed.2d at 455. It is clear that, for the moment at least, the rule of McMillan v. Pennsylvania, 477 U.S. 79, 87-88, 106 S.Ct. 2411, 2417, 91 L.Ed.2d 67, 77 (1986), upholding the imposition by a judge of a parole ineligibility term, within the ordinary non-enhanced sentencing range for the crime, remains the law of the land. Although questioned by the five-justice majority, speaking through Justice Stevens, they stated:
We do not overrule McMillan. We limit its holding to cases that do not involve the imposition of a sentence more severe than the statutory maximum for the offense established by the jury's verdict a limitation identified in the McMillan opinion itself.
[Id., 530 U.S. at 487 n. 13, 120 S.Ct. at 2361 n. 13, 147 L.Ed.2d at 453 n. 13.]
But the majority "reserve[d] for another day the question whether stare decisis considerations preclude reconsideration of its narrower holding." Ibid.
Against this background, and recognizing that a parole ineligibility term could amount to more "real time" than an enhanced sentence, our Supreme Court understandably applied the rule of Apprendi to an ineligibility term required under NERA. State v. Johnson, 166 N.J. 523, 766 A.2d 1126 (2001). But Johnson so held as a matter of "statutory interpretation." Id. at 540, 766 A.2d 1126. It did so because N.J.S.A. 2C:43-7.2e, which required a hearing prior to the imposition of a NERA sentence, "simply requires that the NERA factor be established at a hearing after the defendant's conviction, without specifying either whether the hearing is before the judge or the jury, or the applicable standard of proof." Johnson, supra, 166 N.J. at 539-40, 766 A.2d 1126. Hence, the NERA statute was interpreted to avoid a constitutional defect in the event McMillan does not survive further scrutiny.[3]
Unlike the NERA statute involved in Johnson, the Graves Act specifically requires "the prosecutor [to] establish by a preponderance of the evidence that the weapon used or possessed was a firearm." N.J.S.A. 2C:43-6d. It is a statute similar to the one upheld in McMillan, and we cannot overrule McMillan as a matter of federal constitutional law. Nor can we modify the plain language of N.J.S.A. 2C:43-6d, or overrule our Supreme Court's holdings regarding that statute.
As noted, Johnson dealt with a mandatory parole ineligibility term of 85% of the *820 sentence imposed, and it did not mention or overrule the Graves Act cases which require a judge to determine, by a preponderance of the evidence, whether the defendant used or possessed a firearm during the commission of the offense,[4] thus requiring imposition of a parole ineligibility term of one-third to one-half of the sentence. See, e.g., State v. White, 98 N.J. 122, 484 A.2d 691 (1984); State v. Stewart, 96 N.J. 596, 477 A.2d 300 (1984). In fact, our Supreme Court has expressly held that a judge, not the jury, is to determine if the defendant possessed the firearm for the prerequisite unlawful purpose of using it against a person, the very issue involved in this case. State v. Camacho, supra, 153 N.J. at 56-57, 72-73, 707 A.2d 455. Moreover, in Apprendi itself our Supreme Court (later reversed by the five-justice majority of the United States Supreme Court) expressly agreed with our concurring opinion, which felt bound to affirm Apprendi's "hate crimes" sentence in light of the Graves Act cases, as well as McMillan. See State v. Apprendi, 159 N.J. 7, 25, 731 A.2d 485 (1999), and State v. Apprendi, 304 N.J.Super. 147, 160-61, 698 A.2d 1265 (App.Div.1997)(concurring opinion). According to our Supreme Court, its Graves Act decisions "pose no threat to constitutional liberties." 159 N.J. at 25, 731 A.2d 485.
Given our Supreme Court's opinions on the Graves Act, including its reference to the Graves Act jurisprudence in its Apprendi opinion, 159 N.J. at 25, 731 A.2d 485, the differences between enhanced sentences and ineligibility terms, and both the continued, although questioned, viability of McMillan and the holding in Johnson based on statutory interpretation, we decline, as an intermediate appellate court, to apply Johnson to the Graves Act. We therefore affirm defendant's conviction and the Graves Act sentence imposed thereon.
In Apprendi, we noted that defendant raised no issue under the State Constitution, 304 N.J.Super. at 161, 698 A.2d 1265 (concurring opinion), and Johnson did not consider the impact, if any, of the State Constitution. Similarly, this defendant raises no state constitutional issue. Accordingly, we do not address that subject. However, until application of the State Constitution is considered in this context, or our Supreme Court considers the application of Johnson to the Graves Act, we urge trial judges to try Graves Act cases as if Johnson applied. In other words, if use or possession of a firearm is not an element of the offense, a special verdict should be presented to the jury on that issue, just as the jury should determine whether defendant's unlawful purpose under N.J.S.A. 2C:39-4a was against person or property. See R. 3:19-1.

B.
After the trial judge determined that the Graves Act applied, defense counsel made a Graves Act "escape valve" application. N.J.S.A. 2C:43-6.2 provides that where a defendant has not been previously convicted of a Graves Act offense, and where the three year mandatory minimum "does not serve the interests of justice," the prosecutor may move before the Assignment Judge for a reduced mandatory minimum term of one year, or to place the defendant on probation with the condition of a jail term pursuant to N.J.S.A. 2C:43-2b(2). The sentencing judge may also refer the matter to the Assignment Judge *821 "with the approval of the prosecutor." N.J.S.A. 2C:43-6.2.
If the prosecutor does not so move or consent, the defendant may seek application by arguing to the Assignment Judge that the prosecutor's refusal is a patent and gross abuse of discretion. See State v. Alvarez, 246 N.J.Super. 137, 147, 586 A.2d 1332 (App.Div.1991). More specifically, the defendant must show that in refusing to move or consent to make such an application to the trial court, the decision was arbitrary and amounted to unconstitutional discrimination or denial of equal protection. Alvarez, supra, 246 N.J.Super. at 148, 586 A.2d 1332.
Significantly, neither party suggests that Alvarez is out-of-date in light of the decade of litigation which has evolved concerning analogous provisions of the Comprehensive Drug Reform Act, and particularly N.J.S.A. 2C:35-7 and -12, and N.J.S.A. 2C:43-6f, culminating in State v. Brimage, 153 N.J. 1, 706 A.2d 1096 (1998). See also, e.g., State v. Vasquez, 129 N.J. 189, 609 A.2d 29 (1992); State v. Lagares, 127 N.J. 20, 601 A.2d 698 (1992). Neither party suggests that Attorney General Guidelines are required, and we do not consider the subject. For present purposes, we hold only that this record does not warrant relief under Alvarez.

IV.
The judgment is affirmed in all respects.
NOTES
[1] N.J.S.A. 2C:43-6c provides, in pertinent part, that "[a] person who has been convicted under 2C:39-4a of possession of a firearm with intent to use it against the person of another ... shall be sentenced to a term of imprisonment by the court. The term of imprisonment shall include the imposition of a minimum term. The minimum term shall be fixed at, or between, one-third and one-half of the sentence imposed by the court or three years, whichever is greater, or 18 months in the case of a fourth degree crime, during which the defendant shall be ineligible for parole." This case does not involve a mandatory extended term which presents additional issues.
[2] The majority opinion by Justice Stevens also referred to the right to "notice" in the indictment. Justice Thomas, joined by Justice Scalia as to Parts I and II of the concurrence, would have applied the right to jury trial to an ineligibility term, 530 U.S. at 499-523, 120 S.Ct. at 2367-80, 147 L.Ed.2d at 460-75, but noted that the states are not obligated to return indictments on presentation to a grand jury. Id., 530 U.S. at 499, 120 S.Ct. at 2367-68, 147 L.Ed.2d at 460-61. Hence, this is not the occasion to discuss the notice requirement in the absence of a plea hearing, at which the facts may be acknowledged. Apprendi, 530 U.S. at 488, 120 S.Ct. at 2362, 147 L.Ed.2d at 454. See also R. 3:21-4(f).
[3] N.J.S.A. 2C:43-7.2e was deleted as part of the revision of NERA by L. 2001, c. 129, § 1.
[4] In the context of an Eighth Amendment discussion, Johnson did, however, make reference to State v. Des Marets, 92 N.J. 62, 82, 455 A.2d 1074 (1983), which held that sentencing under the Graves Act does not constitute cruel and unusual punishment. Johnson, supra, 166 N.J. at 548, 766 A.2d 1126.