NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-5556-16
A-0686-17

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

AAKASH A. DALAL,

      Defendant-Appellant.

_____

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

ANTHONY M. GRAZIANO,

      Defendant-Appellant.

_____

> **APPROVED FOR PUBLICATION**
> **April 15, 2021**
> **APPELLATE DIVISION**

Argued January 12, 2021 – Decided April 15, 2021

Before Judges Fisher, Gilson, and Moynihan.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 13-03-0374.

Alan L. Zegas argued the cause for appellant Aakash A. Dalal (Law Offices of Alan L. Zegas, attorneys; Alan L. Zegas and Joshua M. Nahum, on the briefs).

John A. Albright, Designated Counsel, argued the cause for appellant Anthony M. Graziano (Joseph E. Krakora, Public Defender, attorney; John A. Albright, on the briefs).

William P. Miller, Assistant Prosecutor, argued the cause for respondent (Mark Musella, Bergen County Prosecutor, attorney; William P. Miller, of counsel and on the briefs; Nicole Paton, Assistant Prosecutor, and John J. Scaluti, Legal Assistant, on the briefs).

The opinion of the court was delivered by

GILSON, J.A.D.

During a one-month period, between December 10, 2011, and January 11, 2012, five Jewish houses of worship were vandalized, fire-bombed, or attempted to be fire-bombed. Following an investigation, co-defendants Anthony Graziano and Aakash Dalal were charged with multiple crimes related to those acts.

Defendants were tried separately, and juries convicted each defendant of numerous crimes, including first-degree terrorism, N.J.S.A. 2C:38-2(a); first-degree aggravated arson, N.J.S.A. 2C:17-1(a)(2) and N.J.S.A. 2C:2-6; first-degree conspiracy to commit arson, N.J.S.A. 2C:17-1 and N.J.S.A. 2C:5-2; and first-degree bias intimidation, N.J.S.A. 2C:16-1(a)(1) and N.J.S.A. 2C:2-6. Graziano was also convicted of second-degree hindering apprehension or

2

prosecution for conduct constituting the crime of terrorism, N.J.S.A. 2C:38-4(a) and N.J.S.A. 2C:2-6. Both defendants were sentenced to aggregate terms of thirty-five years in prison, with thirty years of parole ineligibility.

Defendants separately appeal, challenging the constitutionality of the New Jersey Anti-Terrorism Act (Act), N.J.S.A. 2C:38-1 to -5. In this consolidated opinion we address a question of first impression: whether the Act is unconstitutionally vague. We hold it is not. Accordingly, we affirm defendants' convictions. We also address an Eighth Amendment challenge to the sentence imposed under the Act and conclude that it is not cruel and unusual.[1]

I.

Sometime between the evening of December 10, 2011, and the following morning, the Jewish temple Beth-Israel in Maywood was vandalized. Swastikas and other white supremacist graffiti were spray-painted on the front entrance and handicap ramp of the temple. The graffiti included the phrase "Jews did 9/11."

Ten days later, on December 21, 2011, the Jewish temple Beth El in Hackensack was vandalized. Multiple swastikas were spray-painted on the

---

[1] Defendants raise other challenges to their convictions and Graziano also appeals from his sentence. We have analyzed and rejected those arguments in separate unpublished opinions also filed today.

doors of the synagogue. The phrase "Jews did 9/11" was spray-painted on the ground in front of the temple.

Less than two weeks later, on January 3, 2012, Molotov cocktails[2] were thrown at the Jewish temple K'hal Adath Jeshurun in Paramus. The fire damage was limited, but investigators located ten separate points of origin of fires on the outside of the temple.

On January 7, 2012, at 2:01 a.m., a surveillance camera outside of the Jewish Community Center in Paramus captured the image of a person wearing a hooded jacket near the front of the center. Later, police discovered Molotov cocktails and bottles containing gasoline in the wooded area behind the parking lot of the center.

In the early morning hours of January 11, 2012, the Jewish temple Beth El in Rutherford was set on fire. A rabbi and his family lived on the second and third floors of the temple. That night, the rabbi, his wife, their five children (ranging in ages from seven to fifteen), the rabbi's father, and his mother-in-law were all sleeping in the temple. The rabbi awoke to a bright orange light outside his window. Within seconds, he heard glass breaking and saw fire spreading in

---

[2]  A Molotov cocktail is "[a] simple bomb consisting of a bottle filled with gasoline and a lighted cloth." Black's Law Dictionary 1204 (11th ed. 2019).

his bedroom. The rabbi was able to put out the fires and he and his wife woke the rest of the family and gathered them together until the police arrived. The rabbi suffered minor burns and no one else was injured.

During the investigation of the fires at the Rutherford temple, police found glass bottles of Crush brand soda and aerosol cans of hairspray. The police then canvassed various stores and learned that on January 9, 2012, a Walmart in Saddlebrook had sold a customer Crush soda, cans of hairspray, as well as motor oil and duct tape. Law enforcement personnel obtained security camera video footage from the Walmart showing the individual making those purchases. That person was wearing a black shirt with red stripes and a red hat.

On January 20, 2012, the police released still photos of the individual from the video to the media and public. In an accompanying press release, the public was asked to contact the Bergen County Prosecutor's Office (BCPO) with any information concerning the identity of the individual. Based on information garnered from the public and the Lodi police, Graziano became a suspect.

On January 23, 2012, Graziano's home was searched pursuant to a warrant. Among other items, law enforcement personnel seized two computers, burnt batting gloves, duct tape, and a book called "The Anarchist Cookbook" containing instructions on how to make a Molotov cocktail. The police also

5

seized a long-sleeved shirt, which matched the shirt of the individual shown in the Walmart video footage. In the garbage can outside the house, the police found ripped bandanas and duct tape, consistent with the tape used to construct the Molotov cocktails found at the Rutherford temple.

Graziano agreed to accompany BCPO detectives to provide biological fluids and other samples to be collected in accordance with the search warrant. At the BCPO, Graziano was read his Miranda [3] rights, waived those rights, and gave a statement. In that statement, he confessed to some of the crimes, but did not implicate Dalal. Graziano admitted to throwing a Molotov cocktail at the K'hal Adath Jeshurun temple on January 3, 2012. He explained that he targeted the temple after doing a Google search for "NJ Synagogues." He also admitted that he assembled a Molotov cocktail at the temple by using items from his home, poured gasoline on the base of the building, then lit and threw the Molotov cocktail.

Graziano also confessed to throwing Molotov cocktails at the Beth El temple in Rutherford, and to being the customer depicted in the Walmart security footage. He admitted to targeting synagogues because of his biased beliefs regarding the Jewish faith.

---

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

A-5556-16

When law enforcement personnel searched Graziano's home, they seized a laptop computer. Andre DiMino, a senior forensic analyst with the BCPO, analyzed the contents of the laptop's hard drive. Although someone had apparently tried to wipe clean the hard drive, DiMino was able to discover and reconstruct instant messaging conversations between "Dreeper1Up" and "QuantumWorm." DiMino's analysis showed the Dreeper1Up profile was used on Graziano's computer.

The day after Graziano was arrested, Dalal called the police tip line to report that he knew Graziano, but he thought his views were crazy. After further investigation, Dalal was arrested on March 2, 2012. On the day of his arrest, Dalal was read his Miranda rights, waived those rights, and gave a statement. When confronted with the instant messaging chats recovered from Graziano's computer, Dalal admitted that he was QuantumWorm. He went on to admit that he was present when the Maywood and Hackensack temples were vandalized, but he claimed that he had only watched Graziano do the spray painting. Dalal also told the police that he was aware that Graziano was planning to throw a Molotov cocktail at the Paramus temple and he acknowledged that he "might have" told Graziano to search online for instructions on how to make a Molotov cocktail.

A-5556-16

Dalal also acknowledged implying to Graziano that there was a "big underworld group," and that he had "encouraged" Graziano and "egged him on a little bit" in planning the attacks. Dalal further admitted that he knew that Graziano was targeting only Jewish people, but he denied hating Jewish people himself and claimed that he was only being "sarcastic" in his comments about Jewish people in his chats with Graziano.

On March 1, 2013, a grand jury issued a thirty-count indictment against defendants, charging them with, among other things, first-degree terrorism (count twenty-nine), and hindering apprehension or prosecution for conduct constituting the crime of terrorism (count thirty). Specifically, count twenty-nine charged defendants with promoting an act of terror and terrorizing five or more people in violation of N.J.S.A. 2C:38-2 by conspiring to vandalize and set fire to synagogues. Count thirty charged defendants with hindering prosecution because of Graziano's attempts to delete incriminating written communications with Dalal from his computer.

Before trial, defendants filed a number of motions including motions to dismiss the terrorism charges, a motion to recuse the entire Bergen County judiciary, a motion to recuse the BCPO, a motion for a change of venue, a motion to sever counts, a motion to suppress the evidence seized from Graziano's house,

a motion to suppress the evidence seized from Dalal's jail cell, and a motion to suppress defendants' statements. All those motions were denied, but Judge Joseph V. Isabella, who sits in Hudson County, was assigned to preside over the trials of both defendants to protect the appearance of impartiality. See State v. Dalal, 221 N.J. 601, 610 (2015).

At each of the defendants' trials, the State presented evidence that Dalal and Graziano played various roles in the vandalism and arsons committed at the four synagogues and Jewish center. The State presented evidence that both defendants were physically present and participated in the vandalism of the two synagogues that took place in December 2011. The State also presented evidence that Graziano acted as the principal in the arsons and attempted arson at the two synagogues and at the Jewish center in January 2012. The evidence showed that Dalal was in New Hampshire during that time working on Ron Paul's 2012 presidential campaign. The State contended, however, that Dalal acted as Graziano's accomplice and masterminded the arsons and attempted arson.

As part of its case, the State called forensic analyst DiMino who explained how he reconstructed the instant messaging chats from Graziano's computer. The analysis showed instant message conversations between Dalal and

9

Graziano, discussing the 2011 vandalisms and 2012 arsons. Consequently, the jury heard testimony and was presented with evidence detailing defendants' communications concerning the arson and vandalism at the synagogues and Jewish center.

As already discussed, the temples in Maywood and Hackensack were vandalized on December 10, 2011 and December 20, 2011. On December 20, 2011 and December 21, 2011, defendants had the following communications:

December 20, 2011

11:33:01 p.m.
GRAZIANO[4]: wow man / almost show time
DALAL: yep / Text me when you're heading out / we'll meet at the same place
       . . . .
DALAL: When are you leaving?
GRAZIANO: i'm leaving around 11:55 / getting gear on now / c ya

December 21, 2011

3:19:23 a.m.
DALAL: It really is a shame we couldn't light that bush on fire / JEWS DID 9/11
GRAZIANO: yeah i tagged that
DALAL: I did too / On the path
GRAZIANO: that swatiska is going to be on the news

---

[4] We have used defendants' real names instead of their assumed chat names of "Dreeper1Up" and "QuantumWorm." Defendants' chats are written verbatim, as depicted in the analyst's reconstruction. Slash marks are used to denote breaks in consecutive messages.

3:29:47 a.m.
DALAL:  The Jews got what they deserved tonight

3:35:19 a.m.
DALAL:  We should get the ones in Paramus next

Dalal then sent Graziano a link to an article about a December 20, 2011 interfaith healing service.  They then wrote the following:

DALAL:  That's today's article
 . . . .
3:41:03 a.m.
DALAL:  HAHAHAHA / This is hilarious
GRAZIANO:  yeah man / we showed them
DALAL:   They literally had some solidarity thing tonight / At like 9PM / Then we struck 4 hours later / This is hilarious

3:45:43 p.m.
GRAZIANO:  those jews are going to pay
DALAL:  It's so hilarious man. We owned them last night
GRAZIANO:  yeah

4:05:26 p.m.
DALAL:  We made New York news:

Dalal then attached a link to an NBC news article about the graffiti at Temple Beth El in Hackensack.

On December 27, 2011, defendants had the following communications:

4:35:39 p.m.
DALAL:  Tomorrow is the last night of Hannukah / We should go on a mission

11

GRAZIANO:  yeah / you told me already / that we were
going / to paramus jew laie / lair
DALAL:  Might be on guard

Dalal sent another link regarding a special service to be held concerning

the desecrated synagogues.

4:39:45 p.m.
DALAL:  The pigs probably are embarrassed. They
have no suspected for the Jew Lairs yet / We could walk
or you could drive / But you'd have to park at a distance
GRAZIANO:  i guess i could drive
DALAL:  "One congregant told Rabbi Schumeister that
she didn't feel safe going to temple after the vandalism
and that it reminded her of what it was like for her in
Europe."  That is just great

Dalal attached an article regarding a reward for the vandalism suspects.

4:42:27 p.m.
DALAL:  They're monitoring "area houses of worship"
GRAZIANO:  yeah i know / i seriously doubt we would
get taken in

5:09:10 p.m.
GRAZIANO:  i saw frumolt / i think he's too scared to
do anything though
DALAL:  Fucking Jew / They're all scared now

On January 3, 2012, fires were started at temple K'hal Adath Jeshurun in

Paramus.  The following day, defendants had the following communications:

8:46:09 p.m.
DALAL:  YO
GRAZIANO:  I'M READY TO BE RELEASED
DALAL:  It didn't burn well

12

GRAZIANO:  well it made the news
DALAL:  That was a joke / It was pathetic

    . . . .

GRAZIANO:  the fired burned out but i'm guessing the cold weather took it out
DALAL:  Basically no damage / It did nothing / You haven't proven yourself / We beat a Jew half to death here in NH
GRAZIANO:  that counts as nothing? / it did damage..
DALAL:  No / That was horrendous
GRAZIANO:  damn man / fucking cold weather
DALAL:  It's colder here / -12F
GRAZIANO:  so before you get back, i'll have to cause significant damage to a gog? / burning one down in this weather is going to be difficult
DALAL:  Yes
GRAZIANO:  i'm going to need more gas
DALAL:  Looks like it


<u>9:18:16 p.m.</u>
GRAZIANO:  so how much damage would be acceptable?
DALAL:  Seriousy damage / or total burnage


<u>9:27:17 p.m.</u>
GRAZIANO:  i'm going to use 5 molotovs
DALAL:  Hahaha

    . . . .

GRAZIANO:  well if i don't put down this gog by the time you get back, it's not even worth going on more missions / the gog will be damaged / i will not fail this time
DALAL:  Good to hear
GRAZIANO: after i do this, it will be on the news / for a BIG REASOn
DALAL:  Hahaha, I saw the articles and the picture / Didn't check my email yet / It was just a little burn on the side

13

A-5556-16

GRAZIANO:  it's a start / does it at least earn a tent on the ranch?
DALAL:  No / It has to actually fucking burn

9:38:58 p.m.
GRAZIANO:  this will go down / significant damage / by the end of the week / mark my words
DALAL:  New one?

. . . .

GRAZIANO:  why hit the same one again? / they'll be there / this one can work / there's woods behind it / i can just spread out the gas and throw the molotovs / you were right / my first arson attempt sucked / but i conquered gathering up the strength to throw the molotov / most people wouldn't do that / now the next gog will make up for my lack of experience
DALAL:  Atleast you got the interal fear out of the way now
GRAZIANO:  yes
DALAL:  It's a step forward and I couldn't have someone afraid of doing that living in the house in SC

9:44:50 p.m.
GRAZIANO:  i will burn this gog down

. . . .

DALAL:  I'll be awaiting the news
GRAZIANO:  significant damage / that's a promise / i'm super pissed / i will not fail

. . . .

DALAL:  No need for promises, but keep trying / I'm not limiting your chances to succeed

Two day later, on January 6, 2012, defendants had the following instant messaging exchange:

11:49:55 p.m.
GRAZIANO:  alright so i have 5 aerosol cans

14

DALAL:  What's the plan?

GRAZIANO:  i plan on putting 1 near the front door / and scattering matches around the front / around 20 matches / front entrance / i will then prepare the molotovs in the woods behind the lair / after they are prepared, i will throw a big molotov filled with alcohol in the front / which will cause the front to explode / fire and aerosol cans equal explosion / i will then throw molotovs in the side windows / which are glass / and then throw the rest of the aerosol cans / inside / which will also cause mini explosions inside / then i'lll throw the rest of the molotovs i have left in the back / and then depart / and have to bike like 12 miles

DALAL:  That actually sounds like a great plan / There aren't closer gogs? / 12 miles seems like a lot

GRAZIANO:  could hit the other one i fucked up on / but that seems risky / no / 12 miles back and forth

DALAL:  Don't go after the same one twice

GRAZIANO:  exactly / so i'm going after this one / after i throw a big molotov in the front / it'll be a huge fucking explosion / and the matches will add to the damage in the front

On January 7, 2012, a security camera at the Jewish Community Center in Paramus showed a person outside the center at approximately 2:00 a.m.  Later Molotov cocktails were found in woods behind the center.  On the following day, defendants had the following instant messaging exchanges:

GRAZIANO:  i finally found an all wood synagogue / congregation beth el rutherford

. . . .

GRAZIANO:   they molotovs were left / but no fingerprints / i used rubber gloves / the jews were out / they protected their gogs / both parking lots were filled / and the lights were on / so i went to the jewish

15

A-5556-16

community center in paramus / it's brick but the front is metal kind of

12:12:12 a.m.
DALAL:  How did that go?
GRAZIANO:  horrible / i was so close
DALAL:  Where is the all wood gog located?

    . . . .
GRAZIANO:  185 montross avenue rutherford, nj

    . . . .
GRAZIANO:  now i know why you want me to do this / ultimate dedication
DALAL:  Yes

    . . . .
GRAZIANO:  i'm not going to paramus again / it's rutherford all wood gog and i'm finished / congregation beth el rutherford
DALAL:  How far is it?
GRAZIANO:  from the hasbrouck heights high school / it's 3.3 miles / i'm not giving up / 3rd time is the charm / i'm going to prepare the molotovs correctly this time / cork the molotov / so i don't have to sit and prepare them
DALAL:  They're definitely watching

12:18:31 a.m.
GRAZIANO:  all wood, it's in a suburb area / i could easily throw the molotovs from the side
DALAL:  Make sure they break through the windows
GRAZIANO:  i'm at fully strength now / it's going down
DALAL:  If necessary, throw a large rock through the window first and then the molotov

12:21:56 a.m.
DALAL:  Also, your actions are famous:  [news article]

16

GRAZIANO: doesn't mean anything / i'm not even guaranteed a tent on the ranch / so in my eyes, it's irrevelevant

DALAL: Not until you burn a jew lair

On January 11, 2012, fires were set at the Temple Beth El in Rutherford and defendants had the following discussions via instant messaging:

9:52:30 p.m.

DALAL: Wow / nice / I'm looking at the house now / Nice fucking throw

GRAZIANO: i'll be making a comeback / "ball of fire through my window"

DALAL: "terrorist attack"

GRAZIANO: dude that ADL jew is hilarious / he looks like he's about to roll over and cry

DALAL: "stalked out for weeks"

GRAZIANO: this is too funny / i can't laugh that hard though / my lungs are still recovering

DALAL: This just shows how pathetic the government is / They likely have 40+ people working on the case / And they can't figure anything out

GRAZIANO: they suck / i disposed of everything

DALAL: You are being honored in the underground

GRAZIANO: really?

DALAL: Yes / You have definitely proven yourself with this

GRAZIANO: i only have one thing i'm upset with / my lighter didn't function correctly / i would of killed them / if i had a torch lighter, they would of been dead / i like molotovs though / i'm going to use cork next time / instead of duck tape to cork the bottle

DALAL: Just seeing the word "firebombed" in the news is great / Dreeper is big in the underground

GRAZIANO: really?

DALAL: You are the leader in this area / You've surpassed what I've done

17

A-5556-16

11:05:59 p.m.

DALAL: Congratulations

GRAZIANO: they are concerned / it's everywhere / fox 5, cnn / cbs

DALAL: They are shaking in their fucking Jew boots

GRAZIANO: i know they are / just wait until i get a gun

DALAL: We should use different tactics for the next week or so

GRAZIANO: what tactics?

DALAL: Psychological warfare

GRAZIANO: ha / ah / destroy their morale / well just hand out fliers / and spread videos / this is insNW / insane

DALAL: They seriously don't even have a number on how many people did it

GRAZIANO: they suck man

DALAL: They have nothing

GRAZIANO: dude, it's pathetic

11:54:01 p.m.

GRAZIANO: says rabbi barely escaped house

DALAL: Even though the house looks perfectly fine

GRAZIANO: yeah / i wish i would of killed him

January 13, 2012

10:12:32 a.m.

GRAZIANO: so i'm guessing the high security alert is going to postpone you bombing buildings right?

DALAL: Jew buildings in Bergen County, sure

January 23, 2012

12:20:00 p.m.

18

A-5556-16

GRAZIANO: i rebooted my computer on friday / wiped everything out / saved it on a flash drive / rain cleaning the truck nicely
DALAL: Well done. No traces of anything left

Based on that evidence, as well as other evidence presented at defendants' trials, separate juries convicted each defendant of, among other crimes, first-degree terrorism, first-degree aggravated arson, and first-degree conspiracy to commit arson.

## II.

Defendants appeal and argue that their terrorism convictions should be reversed because the Act is unconstitutional on its face and as applied to them. In connection with those arguments, defendants also assert that the Act impermissibly delegates a legislative function to the executive branch thereby allowing arbitrary and selective enforcement. Graziano contends that the problem of arbitrary enforcement is compounded because the Attorney General has failed to issue guidelines spelling out when the Act will be applied. Finally, Graziano challenges his sentence under the Act, arguing that his thirty-two-year sentence violated his Eighth Amendment rights because his sentence was cruel and unusual.

In his appeal, Dalal articulates his arguments as follows:

A-5556-16

Point I – <u>THE TRIAL COURT ERRED BY FAILING TO DISMISS COUNTS 29 AND 30 OF THE INDICTMENT.</u>

A.     COUNTS 29 AND 30 OF THE INDICTMENT ARE UNCONSTITUTIONALLY VAGUE ON THEIR FACE

B.     COUNTS 29 AND 30 OF THE INDICTMENT ARE UNCONSTITUTIONALLY VAGUE AS APPLIED TO THE FACTS OF THIS CASE

C.     THE ENTIRE VERDICT MUST BE VACATED BECAUSE THE EVIDENCE AND TESTIMONY PRESENTED WITH RESPECT TO TERRORISM PERVADED THE TRIAL

D.     COUNTS 29 AND 30 OF THE INDICTMENT ARE UNCONSTITUTIONAL BECAUSE THEY IMPERMISSIBLY DELEGATE A LEGISLATIVE FUNCTION TO THE EXECUTIVE BRANCH

Graziano articulates his constitutional challenges as:

<u>POINT I</u> – THE SEPTEMBER 11TH, 2001, ANTI-TERRORISM ACT, N.J.S.A. 2C:38-1 TO -2 IS UNCONSTITUTIONALLY VAGUE, AND THEREFORE, DEFENDANT'S CONVICTIONS MUST BE REVERSED.

<u>POINT II</u> – THE RECORD DOES NOT SUPPORT THE TRIAL COURT'S LEGAL CONCLUSION THAT THE "SAFEGUARD" PROVISION OF THE TERRORISM STATUTE REQUIRING ATTORNEY GENERAL APPROVAL FOR PROSECUTION, N.J.S.A. 2C:38-2E, SAVES THE STATUTE FROM CONSTITUTIONAL INFIRMITY AFTER THE COURT DENIED ANY DISCOVERY INTO THE

20

APPROVAL PROCESS; EACH PROSECUTION UNDER THE STATUTE CONSTITUTES A DE FACTO PATENT AND GROSS ABUSE OF DISCRETION ABSENT ATTORNEY GENERAL GUIDELINES ON THE SUBJECT.

POINT III – DEFENDANT'S CONVICTIONS MUST BE REVERSED BECAUSE THE BERGEN COUNTY PROSECUTOR'S OFFICE DID NOT OBTAIN THE EXPRESS AUTHORIZATION OF THE ATTORNEY GENERAL TO CHARGE TERRORISM IN THIS CASE IN VIOLATION OF THE PLAIN TEXT OF THE STATUTE.

POINT [IV] – THE TERRORISM SENTENCE VIOLATES THE CONSTITUTIONAL PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENTS.

We reject all these arguments and hold that the Act is constitutional.

A. Standard of Review

Appellate courts apply a de novo standard when determining the constitutionality of a statute. State v. Hemenway, 239 N.J. 111, 125 (2019). "A presumption of validity attaches to every statute." State v. Lenihan, 219 N.J. 251, 266 (2014) (first citing State v. Muhammad, 145 N.J. 23, 41 (1996); and then citing In re C.V.S. Pharmacy Wayne, 116 N.J. 490, 497 (1989)). Our Supreme Court has explained that "any act of the Legislature will not be ruled void unless its repugnancy to the Constitution is clear beyond a reasonable doubt." Ibid. (quoting Muhammad, 145 N.J. at 41). Accordingly, "[e]ven where

21

a statute's constitutionality is 'fairly debatable, courts will uphold' the law." Ibid. (quoting Newark Superior Officers Ass'n v. City of Newark, 98 N.J. 212, 227 (1985)).

B.    Vagueness

"A statute 'is void if it is so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application.'" Id. at 267 (quoting Hamilton Amusement Ctr. v. Verniero, 156 N.J. 254, 279-80 (1998)). The constitutional flaw with a vague statute is that it may deny due process by failing to provide fair notice of the prohibited conduct. Ibid.; see also U.S. Const. amend. XIV, § 1. Statutes can also be unconstitutionally vague if they authorize or allow arbitrary and selective enforcement. Hill v. Colorado, 530 U.S. 703, 732 (2000).

A statute can be challenged as being either facially vague or vague as applied. Lenihan, 219 N.J. at 267. A law is facially vague if it is vague in all applications. United States v. Salerno, 481 U.S. 739, 745 (1987); Lenihan, 219 N.J. at 267. Accordingly, a facial due process challenge is particularly difficult to present and establish. Salerno, 481 U.S. at 745.

"A statute that 'is challenged as vague as applied must lack sufficient clarity respecting the conduct against which it is sought to be enforced.'"

Lenihan, 219 N.J. at 267 (quoting Visiting Homemaker Serv. of Hudson Cnty. v. Bd. of Chosen Freeholders, 380 N.J. Super. 596, 612 (App. Div. 2005)). If the statute "is not vague as applied to a particular party, it may be enforced even though it might be too vague as applied to others." Ibid. (quoting State v. Cameron, 100 N.J. 586, 593 (1985)). Accordingly, a person challenging a statute must normally show that it is vague as applied to him or her. See Holder v. Humanitarian L. Project, 561 U.S. 1, 18-19 (2010); Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., 455 U.S. 489, 495 (1982); State v. B.A., 458 N.J. Super. 391, 410 (App. Div. 2019).

Defendants argue that two recent decisions by the United States Supreme Court allow facial vagueness challenges even if the statute is not vague as applied to their conduct. See Sessions v. Dimaya, 138 S. Ct. 1204, 1214 n.3 (2018); Johnson v. United States, 576 U.S. 591, 601-03 (2015). Johnson considered a challenge to a residual sentencing clause in the Armed Career Criminal Act (the ACCA), 18 U.S.C. § 924(e)(1). 576 U.S. at 593. The ACCA enhanced the sentence for a firearms conviction if the defendant had three or more prior convictions for a "serious drug offense" or a "violent felony." 18 U.S.C. § 924(e)(1). The Court held § 924(e)(2)(B)'s residual clause was facially vague because it left "uncertainty about how to estimate the risk posed by a

23

crime" and "uncertainty about how much risk it takes for a crime to qualify as a violent felony." <u>Johnson</u>, 576 U.S. at 597-98. Accordingly, the Court reasoned that by the statute's own ambiguous terms, there was no clearly proscribed conduct in any given scenario. <u>See</u> <u>id.</u> at 598.

<u>Dimaya</u> invalidated similar language in the Immigration and Nationality Act, 18 U.S.C. § 16. 138 S. Ct. at 1214-16. There, the Court again considered the facial constitutionality of a residual clause, § 16(b), which required courts to determine whether the nature of a given offense involved a substantial risk of physical force against a person or property. Looking to <u>Johnson</u>, the Court held that § 16(b) was facially vague because it required courts "to picture the kind of conduct that the crime involves in 'the ordinary case,'" as well as "to judge whether that abstraction presents . . . [a] sufficiently-large degree of risk." <u>Dimaya</u>, 138 S. Ct. at 1215-16.

In neither <u>Johnson</u> nor <u>Dimaya</u> did the Court explicitly reject the concept that a person challenging a statute must normally show that it is vague as applied to him or her. Consequently, some federal and state appeals courts have concluded that neither <u>Johnson</u> nor <u>Dimaya</u> overruled the principle that, for a court to consider a facial challenge, a challenger must be able to successfully bring an as-applied challenge. <u>See, e.g.</u>, <u>United States v. Requena</u>, 980 F.3d 30,

39-42 (2d Cir. 2020) (considering defendant's conduct in vagueness challenge and distinguishing Johnson as matter involving "idealized," abstract behavior); Guerrero v. Whitaker, 908 F.3d 541, 545 (9th Cir. 2018) (noting that "[t]he problem in Johnson and Dimaya . . . was that the uncertainty had to be applied to an idealized crime"); United States v. Lynch, 881 F.3d 812, 818-19 (10th Cir. 2018) (reasoning that Johnson requires a "full vagueness analysis" looking at defendant's particular circumstances); Smallwood v. State, 851 S.E.2d 595, 599 (Ga. 2020) (requiring challenger to successfully mount as-applied challenge before facial challenge could be considered); see also United States v. Portanova, 961 F.3d 252, 262-63 (3d Cir. 2020) (considering a void-for-vagueness challenge post-Johnson "on a case by case basis").

We agree with those cases, and do not read Johnson or Dimaya as permitting a facial vagueness challenge without regard to the conduct at issue. We also see no good reason to consider abstract arguments. Therefore, we need not address defendants' hypothetical contentions concerning how the Act might be applied. "'[A] party may test a law for vagueness as applied only with respect to his or her particular conduct,' defendant[s'] multiple hypotheticals about the law's potential vagueness are irrelevant." Lenihan, 219 N.J. at 269 (quoting Cameron, 100 N.J. at 593); see also Town Tobacconist v. Kimmelman, 94 N.J.

85, 99 (1983) ("[W]e know of no doctrine that requires a court to consider and determine the validity of every hypothetical application of legislation when a pre-enforcement vagueness attack is involved.").

C.    Whether the Act is Vague as Applied

"The degree of vagueness that the Constitution tolerates — as well as the relative importance of fair notice and fair enforcement — depends in part on the nature of the enactment." Hoffman Ests., 455 U.S. at 498. An offense must be defined "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender v. Lawson, 461 U.S. 352, 357 (1983) (citations omitted). "To be vague 'as applied,' the law must not clearly prohibit the conduct on which the particular charges were based." State v. Saunders, 302 N.J. Super. 509, 521 (App. Div. 1997) (citing Cameron, 100 N.J. at 593).

Penal laws "are subjected to sharper scrutiny and given more exacting and critical assessment under the vagueness doctrine than civil enactments." Cameron, 100 N.J. at 592. "Nonetheless, 'vagueness may be mitigated by a scienter requirement, especially when a court examines a challenge claiming that the law failed to provide adequate notice of the proscribed conduct.'"

Lenihan, 219 N.J. at 267 (quoting Saunders, 302 N.J. Super. at 517). Guided by these legal principles, we turn to an examination of the Act.

D.    The Anti-Terrorism Act and Its Application to Defendants

In 2011 and 2012, when defendants vandalized, attempted, and set fires to the synagogues and the Jewish center, the Act provided:

> A person is guilty of the crime of terrorism if he commits or attempts, conspires or threatens to commit any crime enumerated in subsection c. of this section with the purpose:
>
> (1)    to promote an act of terror; or
>
> (2)    to terrorize five or more persons; or
>
> (3)    to influence the policy or affect the conduct of government by terror; or
>
> (4)    to cause by an act of terror the impairment or interruption of public communications, public transportation, public or private buildings, common carriers, public utilities or other public services.
>
> [N.J.S.A. 2C:38-2(a).][5]

---

[5]  In 2019, the Legislature amended the Act to add a fifth purpose:

> (5)    to influence or incite an act of terror against an individual or group of individuals based on their actual or perceived race, religion, color, national origin, affectional or sexual orientation, sex, gender identity or

27

In subsection c, the Act lists twenty-one crimes, including arson and conspiracy to commit arson as predicate offenses on which terrorism can be based. N.J.S.A. 2C:38-2(c). The Act also has a provision covering "any other crime involving a risk of death or serious bodily injury to any person." Ibid.

The Act defines "terror" to mean "the menace or fear of death or serious bodily injury." "'Terrorize' means to convey the menace or fear of death or serious bodily injury by words or actions." N.J.S.A. 2C:38-2(d). The Act also states that

> [a] prosecution pursuant to this section may be brought by the Attorney General, his assistants and deputies within the Division of Criminal Justice, or by a county prosecutor or a designated assistant prosecutor if the county prosecutor is expressly authorized in writing by the Attorney General to prosecute a violation of this section.
>
> [N.J.S.A. 2C:38-2(e).]

---

> expression, disability, creed, or any other characteristic protected under the "Law Against Discrimination," . . . if the underlying crime is a crime of the first or second degree.
>
> [L. 2019, c. 351, § 1.]

That amendment was made effective January 15, 2020. Ibid.

Dalal and Graziano were both convicted of aggravated arson and conspiracy to commit arson. There was nothing vague about their purpose to promote an act of terror. Together, they planned and discussed how Graziano would fire-bomb the Rutherford synagogue. Graziano then prepared and threw multiple Molotov cocktails at the synagogue setting multiple fires. That proscribed conduct allowed a jury to infer that both defendants had the purpose to terrorize Jewish people throughout northern New Jersey and beyond.

The jury, moreover, had defendants' own words describing their purpose. Defendants discussed their desire to leave the Bergen County Jewish community "shaking in their fucking Jew boots[.]"

> GRAZIANO: they are concerned / it's everywhere / fox 5, cnn / cbs
> DALAL: They are shaking in their fucking Jew boots
> GRAZIANO: i know they are / just wait until i get a gun

Defendants also wanted to engage in "psychological warfare," "destroy [the] morale [of their victims]," and in Graziano's words "kill[] them."

> GRAZIANO: i only have one thing i'm upset with / my lighter didn't function correctly / i would of killed them / if i had a torch lighter, they would of been dead / i like molotovs though / i'm going to use cork next time / instead of duck tape to cork the bottle
> DALAL: Just seeing the word "firebombed" in the news is great / Dreeper is big in the underground

29

Most specifically, defendants themselves acknowledge they were engaging in terrorism:

> DALAL:  Wow / nice / I'm looking at the house now / Nice fucking throw
> GRAZIANO:  i'll be making a comeback / "ball of fire through my window"
> DALAL:  "terrorist attack"

It is important to recognize that defendants were not charged or prosecuted for their words.  Instead, defendants were prosecuted for their acts of arson that had the purpose to promote terror and to terrorize.  Their words, however, can be used to establish those purposes and that use does not violate the First Amendment because it is defendants' conduct and not their words that subjected them to prosecution.

Considered in totality, a jury could reasonably conclude that defendants engaged in a campaign of actions to instill fear in the Jewish community.  In addition, from a due process perspective, defendants were on clear notice that such a campaign would be correctly perceived as terrorism because its purpose was to instill fear in people of the Jewish faith.  That fear included the fear that their houses of worship were being fire-bombed, as well as the related fear of the potential death and injuries that can result from arson.  In short, defendants'

30

conduct fell squarely within the prohibited conduct identified by the Act. Consequently, the Act is not vague in its application to defendants.

E.      The Enforcement of the Act

Defendants also contend that the Legislature's definition of terrorism is "outside the normal understanding of the concept of terrorism, and outside the normal range of conduct that is prohibited by terrorism statutes." Dalal contends that the Act impermissibly delegates to the Attorney General and prosecutors the decision of when to enforce the Act and thereby allows the Act to be arbitrarily and selectively enforced. We disagree.

Defendants point to the federal Anti-Terrorism Act (ATA), 18 U.S.C. §§ 2331-2339D, and argue that the ATA includes a political component that is missing from the Act. There are two flaws with defendants' argument about the ATA. First, the ATA has various components, including a material support provision that does not require a political motivation. See § 2339B (criminalizing "knowingly provid[ing] material support or resources to a foreign terrorist organization"). The material support statute has been challenged for vagueness and found to be constitutional by the United States Supreme Court. Humanitarian L. Project, 561 U.S. at 20-21 (holding statutory terms clearly applied to appellants' proposed conduct).

31

Second and more directly, even though other parts of the ATA refer to political conduct, the New Jersey Legislature's decision not to require political motivation does not make the Act vague. While the federal ATA, as well as many other states' terrorism statutes, link terrorism to a political purpose, there is nothing unconstitutionally vague about New Jersey's Act. As already discussed, the Act requires the commission of an enumerated crime with the purpose to promote an act of terror or to terrorize five or more persons. The definitions of "terror" and "to terrorize" used by the Legislature provide sufficient guidance to the Attorney General and prosecutors on when to enforce the Act. As already discussed, the Act requires the State to prove that defendants acted with the purpose to promote terror or to terrorize.

Moreover, there is nothing in the record that supports the contention that either defendants' prosecution was arbitrary or selective. As required by the Act, the Attorney General authorized the Bergen County Prosecutor in writing to pursue the terrorism charges. In that regard, the Deputy Director of the Division of Criminal Justice sent the prosecutor an email stating that the Attorney General had reviewed the prosecutor's request to charge defendants under the Act and was authorizing the prosecutions. We reject Graziano's contention that an email sent by the Deputy Director of the Division of Criminal

32

Justice was not sufficient when the Deputy Director represented that the Attorney General had reviewed the prosecutor's request and was authorizing the prosecution.

We also reject the argument that the Attorney General needs to issue guidelines. While there is nothing preventing the Attorney General from issuing guidelines, we discern nothing vague or arbitrary in the prosecution of either defendant without those guidelines. The Bergen County Prosecutor did not need guidelines to determine that defendants' campaign of arson and vandalism against a religious community could be prosecuted as terrorism.

F. Whether the Act Imposes a Cruel and Unusual Punishment

Finally, Graziano argues that the Act's sentencing scheme violates the Eighth Amendment's prohibition against cruel and unusual punishment. See N.J.S.A. 2C:38-2(b). We reject this argument.

The Eighth Amendment of the United States Constitution provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. That provision applies to the States through the Fourteenth Amendment. Roper v. Simmons, 543 U.S. 551, 560 (2005); see also N.J. Const. art. I, ¶ 12 (also prohibiting "cruel and unusual punishments"). The prohibition against cruel and unusual

punishment "flows from the basic 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.'" Simmons, 543 U.S. at 560 (alteration in original) (quoting Atkins v. Virginia, 536 U.S. 304, 311 (2002)).

There is a three-part test to determine whether a criminal sentence is unconstitutionally cruel and unusual. State v. Maldonado, 137 N.J. 536, 556-57 (1994) (citing Coker v. Georgia, 433 U.S. 584, 592 (1977)). First, courts consider "whether the punishment conforms with contemporary standards of decency; second, whether the punishment is grossly disproportionate to the offense; and third, whether the punishment goes beyond what is necessary to accomplish any legitimate penological objective." State v. Pimentel, 461 N.J. Super. 468, 481-82 (App. Div. 2019) (quoting State v. Johnson, 166 N.J. 523, 548 (2001)). Defendant must make "a substantial showing that the [Act] violates those principles[.]" Johnson, 166 N.J. at 548. Absent that showing, we "must respect the legislative will and enforce the punishment." Ibid. (citing State v. Hampton, 61 N.J. 250, 274 (1972)).

The test "is generally the same" under both the Federal and our State Constitutions, but our State Constitution sometimes offers greater protection against cruel and unusual punishment. State v. Zuber, 227 N.J. 422, 438 (2017)

(citations omitted). The United States Supreme Court looks to "evolving standards of decency that mark the progress of a maturing society," and whether punishment is justified by at least one legitimate penological purpose — "rehabilitation, deterrence, [or] retribution." Kennedy v. Louisiana, 554 U.S. 407, 419-20 (2008). Additionally, under the Eighth Amendment "[a] gross disproportionality principle is applicable to sentences for terms of years." Lockyer v. Andrade, 538 U.S. 63, 72 (2003).

Defendant has not established any of the prongs of the three-part test. He does not address the "contemporary standards of decency," but instead likens his fire-bombing the Rutherford synagogue to third-degree aggravated assault with a deadly weapon, N.J.S.A. 2C:12-1(b)(2), which is punishable by up to five years of imprisonment, N.J.S.A. 2C:43-6(a)(3). There are two flaws with defendant's argument. First, the offenses forming the basis for his terrorism conviction were first-degree aggravated arson and first-degree conspiracy to commit arson, not a third-degree offense. Second, his argument does not prove the Act is so punitive that it goes beyond what contemporary standards of decency allow.

Several states authorize significant punishments for the crime of terrorism. Where, as here, the underlying offense is a first-degree crime, the

35

penalty often matches or exceeds the thirty-year to life imprisonment range proscribed by N.J.S.A. 2C:38-2(b).  See, e.g., N.Y. Penal Law § 490.25(2)(d) (McKinney 2001) (mandating life imprisonment without parole); Ohio Rev. Code Ann. § 2909.24(B)(3) (West 2021) (same); 18 Pa. Stat. and Cons. Stat. Ann. § 2717(b)(2) (West 2017) (allowing imprisonment up to forty years); 720 Ill. Comp. Stat. 5/29D-14.9(b) (2016) (allowing custodial sentence of twenty years to life, where no deaths occur).  Although these laws are not identical in all respects to the Act, they reflect that the Act conforms with contemporary standards of decency, and is not unconstitutionally punitive.

Nor do we find the thirty-year imprisonment minimum grossly disproportionate to the offense.  Terrorism is a serious offense against society, and "the Legislature has wide authority to enact mandatory minimum sentences to deter and punish specified criminal behavior."  Pimentel, 461 N.J. Super. at 486; see, e.g., Hampton, 61 N.J. at 273-74 (upholding constitutionality of thirty-year mandatory minimum sentence for kidnapping, a "serious offense[] against society").

Finally, we do not find the Act's sentencing scheme goes beyond what is necessary to accomplish a legitimate penological objective.  Pimentel, 461 N.J. Super. at 482.  The Act was signed into law less than a year after the September

36

11, 2001 terrorist attacks, to remedy shortcomings in the law at that time and better protect citizens of New Jersey.  Press Release, State of N.J. Governor's Off., McGreevey Signs "September 11th 2001 Anti-Terrorism Act" Into Law (June 18, 2002).  The penalties imposed by the Act are permissible, reasonable deterrents given the gravity of the offense.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5556-16